UNITED STATES COURT OF INTERNATIONAL TRADE
Before the Honorable Jennifer Choe-Groves, Judge

| | |
|---|---|
| NANJING DONGSHENG SHELF MANUFACTURING CO., LTD., | |
| *Plaintiff,* | |
| *v.* | |
| UNITED STATES, | Court No. 24-00085 |
| *Defendant,* | |
| *and* | |
| COALITION FOR FAIR RACK IMPORTS, | |
| *Defendant-Intervenor.* | |

DEFENDANT-INTERVENOR'S OPPOSITION TO
PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin
Luke A. Meisner
Saad Y. Chalchal*
Schagrin Associates
900 Seventh St. N.W. Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel for the Coalition on Fair Rack Imports*

Date: January 28, 2025

*Admitted only in New York and New Jersey. Practice limited to matters before federal courts and agencies.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................................... i

STATEMENT PURSUANT TO RULE 56.2(c) ...................................................................... 2

    I.        Administrative Determination Under Review ............................................................ 2

    II.      Issues Presented for Appeal .................................................................................... 2

BACKGROUND AND PROCEDURAL HISTORY .................................................................. 3

    I.        Commerce's Court-Approved Policy of Establishing a Single Rate for the China-Wide Entity and the Rebuttable Presumption of Government Control ...................... 3

    II.      The Less-Than-Fair-Value Investigation and the First Three Administrative Reviews of the Antidumping Duty Order .................................................................................. 5

    III.    Commerce's Rejection of Dongsheng's Untimely Separate Rate Certification and Decision to Assign Dongsheng the China-Wide Entity Rate in the *Final Results* ...... 6

        A.      Commerce's Initiation of the Administrative Review ........................................... 6

        B.      The Filing of Separate Rate Applications and Certifications ................................ 6

        C.      Commerce's Selection of Respondents for Individual Examination .................... 7

        D.      Commerce's Denial of Dongsheng's Belated Request to Accept its Untimely Separate Rate Certification and Preliminary Decision to Assign Dongsheng the China-Wide Entity Rate ......................................................................................... 8

        E.      Commerce's *Final Results* .................................................................................. 10

ARGUMENT ......................................................................................................................... 11

    I.        Standard of Review ................................................................................................ 11

    II.      Commerce's Rejection of Dongsheng's Untimely Filed Separate Rate Certification Was Lawful ............................................................................................................... 12

    III.    Dongsheng Fails to Demonstrate that Commerce Was Legally Required to Accept Dongsheng's Untimely Separate Rate Certification .................................................. 15

        A.      Dongsheng's Separate Rate Certification Was Filed After the Deadline and the Reason for the Late Filing Does Not Constitute an Extraordinary Circumstance 15

        B.      Contrary to Dongsheng's Assertions, Decisions of This Court and the Federal Circuit Recognize Commerce's Authority to Enforce its Deadline and Support Commerce's Rejection of Dongsheng's Untimely Separate Rate Certification ... 18

        C.      Dongsheng's Remaining Arguments Do Not Undermine Commerce's Rejection of Dongsheng's Untimely Separate Rate Certification .......................................... 22

    IV.    Commerce Lawfully Excluded Dongsheng from Consideration as a Potential Mandatory Respondent or Voluntary Respondent ................................................... 24

    V.      Commerce's Decision to Assign Dongsheng the China-Wide Entity Rate Is Supported By Substantial Evidence and In Accordance With Law ............................................. 27

CONCLUSION ...................................................................................................................... 32

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Albemarle Corp. v. United States*,
  821 F.3d 1345 (Fed. Cir. 2016)..........................................................................................3

*Altx, Inc. v. United States*,
  370 F.3d 1108 (Fed. Cir. 2004)..........................................................................................11

*Bebitz Flanges Works Pvt. Ltd. v. United States*,
  433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020)......................................................................26

*Cambria Co. v. United States*,
  705 F. Supp. 3d 1369 (Ct. Int'l Trade 2024)......................................................................21

*Celik Halat ve Tel Sanayi A.S. v. United States*,
  557 F. Supp. 3d 1348 (Ct. Int'l Trade 2022)......................................................................20

*China Manufacturers Alliance, LLC v. United States*,
  1 F.4th 1028 (Fed. Cir. 2021) .........................................................................................3–4

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)...........................................................................................................22

*Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*,
  464 F.3d 1306 (Fed. Cir. 2006)..........................................................................................14

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938)...........................................................................................................11

*Diamond Sawblades Manufacturers Coalition v. United States*,
  866 F.3d 1304 (Fed. Cir. 2017).....................................................................................4, 27–29

*Dongtai Peak Honey Indus. Co. v. United States*,
  777 F.3d 1343 (Fed. Cir. 2015)...................................................................11–12, 14, 19, 22

*FCC v. NextWave Pers. Commc'ns, Inc.*,
  537 U.S. 293 (2003)...........................................................................................................11

*Ferrostaal Metals Gmbh v. United States*,
  518 F. Supp. 3d 1357 (Ct. Int'l Trade 2021)......................................................................20

*Fort Stewart Schools v. Federal Labor Relations Authority*,
  495 U.S. 641 (1990)......................................................................................................17–18

*Grobest & I-Mei Indus. (Vietnam) Co. v. United States*,
    815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012) ........................................18–20

*Grupo Acerero S.A. de C.V. v. United States*,
    698 F. Supp. 3d 1320 (Ct. Int'l Trade 2024) ..................................................19

*Huvis Corp. v. United States*,
    525 F. Supp. 2d 1370 (Ct. Int'l Trade 2007) ..................................................11

*Jinko Solar Imp. and Exp. Co. v. United States*,
    701 F. Supp. 3d 1367 (Ct. Int'l Trade 2024) ..............................14, 22, 29

*Matra Americas, LLC v. United States*,
    681 F. Supp. 3d 1339 (Ct. Int'l Trade 2024) ..................................................20

*Mid Continent Steel & Wire, Inc. v. United States*,
    203 F. Supp. 3d 1295 (Ct. Int'l Trade 2017) ..............................................15–16

*Nippon Steel Corp. v. United States*,
    458 F.3d 1345 (Fed. Cir. 2006) ........................................................................11

*Oman Fasteners, LLC v. United States*,
    No. 2023-1661, 2025 WL 37898 (Fed. Cir. Jan. 7, 2025) ........................29–30

*PrimeSource Building Prods., Inc. v. United States*,
    111 F.4th 1320 (Fed. Cir. 2024) ......................................................................26

*Prime Time Commerce LLC v. United States*,
    396 F. Supp. 3d 1319 (Ct. Int'l Trade 2019) ..................................................28

*PSC VSMPO-Avisma Corp. v. United States*,
    688 F.3d 751 (Fed. Cir. 2012) ......................................................12, 23, 29

*Repwire LLC v. United States*,
    628 F. Supp. 3d 1288 (Ct. Int'l Trade 2023) ..............................14–15, 26

*Roberts v. United States*,
    745 F.3d 1158 (Fed. Cir. 2014) ........................................................................14

*Sigma Corp. v. United States*,
    117 F.3d 1401 (Fed. Cir. 1997) ..........................................................................4

*SolarWorld Americas, Inc. v. United States*,
    234 F. Supp. 3d 1286 (Ct. Int'l Trade 2017). ..........................................4, 28

*Suntec Indus. Co. v. United States,*
   857 F.3d 1363 (Fed. Cir. 2017) .................................................................12

*Torrington Co. v. United States,*
   82 F.3d 1039 (Fed. Cir. 1996) ..........................................................17–18

*Transcom, Inc. v. United States,*
   294 F.3d 1371 (Fed. Cir. 2002) ..............................................................29

*Trinity Manufacturing, Inc. v. United States,*
   549 F. Supp. 3d 1370 (Ct. Int'l Trade 2021) ..........................18–19, 31

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
   435 U.S. 519 (1978) ...............................................................................11, 14

*Yantai Timken Co. v. United States,*
   521 F. Supp. 2d 1356 (Ct. Int'l Trade 2007) ........................................14

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ........................................................................11

19 U.S.C. § 1673d(c)(1)(B)(i)(I) ......................................................................3

19 U.S.C. § 1673d(c)(1)(B)(i)(II) .....................................................................3

19 U.S.C. § 1675(a)(3)(A) ...............................................................................11

19 U.S.C. § 1677f-1(c)(2) ................................................................................25

19 U.S.C. § 1677e(b) ............................................................................27–28, 30

19 U.S.C. § 1677e(d)(2) ...................................................................................30

19 U.S.C. § 1677e(d)(3) ...................................................................................29

19 U.S.C. § 1677m(a) ......................................................................................26

**Regulations**

19 C.F.R. § 351.107(d) .......................................................................................3

19 C.F.R. § 351.107 (2025) ............................................................................3–4

19 C.F.R. § 351.108 (2025) ................................................................................4

19 C.F.R. § 351.204(d)(2) .................................................................................25

19 C.F.R. § 351.302(a) ....................................................................................14

19 C.F.R. § 351.302(b) ....................................................................................13

19 C.F.R. § 351.302(c) ..............................................................16, 18–19, 22, 31

19 C.F.R. § 351.302(d) ................................................................................23–25

19 C.F.R. § 351.302(d)(1)(i) ............................................................................14

19 C.F.R. § 351.303(b)(1) ................................................................................12

**Federal Register Notices**

*Antidumping Proceedings: Announcement of Change in Department Practice for
Respondent Selection and Conditional Review of the Nonmarket Economy Entity in NME
Antidumping Duty Proceedings,*
    78 Fed. Reg. 65,963 (Dep't Commerce Nov. 4, 2013) .........................................3–4

*Cast Iron Soil Pipe from the People's Republic of China,*
    83 Fed. Reg. 8,053 (Dep't Commerce Feb. 23, 2018) ........................................26–27

*Certain Steel Racks and Parts Thereof from the People's Republic of China,*
    89 Fed. Reg. 82,213 (Dep't Commerce Oct. 10, 2024) ...........................................30

*Certain Steel Racks and Parts Thereof from the People's Republic of China,*
    89 Fed. Reg. 25,235 (Dep't Commerce Apr. 10, 2024) ..................................... *passim*

*Certain Steel Racks and Parts Thereof from the People's Republic of China,*
    88 Fed. Reg. 69,612 (Dep't Commerce Oct. 6, 2023) ............................................10

*Certain Steel Racks and Parts Thereof from the People's Republic of China,*
    88 Fed. Reg. 41,074 (Dep't Commerce June 23, 2023) ...........................................5

*Certain Steel Racks and Parts Thereof from the People's Republic of China,*
    88 Fed. Reg. 21,179 (Dep't Commerce Apr. 10, 2023) ...........................................5

*Certain Steel Racks and Parts Thereof from the People's Republic of China,*
    87 Fed. Reg. 33,711 (Dep't Commerce June 3, 2022) ............................................5

*Certain Steel Racks and Parts Thereof from the People's Republic of China,*
    87 Fed. Reg. 20,817 (Dep't Commerce Apr. 8, 2022) ............................................5

*Certain Steel Racks and Parts Thereof from the People's Republic of China*,
  84 Fed. Reg. 48,584 (Dep't Commerce Sept. 16, 2019)..............................................5

*Certain Steel Racks and Parts Thereof from the People's Republic of China*,
  84 Fed. Reg. 35,595 (Dep't Commerce July 24, 2019) ...............................................5

*Extension of Time Limits*,
  78 Fed. Reg. 57,790 (Dep't Commerce Sept. 20, 2013)................................16–17, 19

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
  88 Fed. Reg. 50 (Dep't Commerce Jan. 3, 2023)..........................................................6

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
  87 Fed. Reg. 66,275 (Dep't Commerce Nov. 3, 2022) .................................................6

*Paper File Folders from the People's Republic of China, India, and the Socialist Republic of Vietnam*,
  87 Fed. Reg. 67,441 (Dep't Commerce Nov. 8, 2022) .........................................26–27

*Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws*,
  89 Fed. Reg. 101,694 (Dep't Commerce Dec. 16, 2024) .........................................3–4

*Utility Scale Wind Towers from the Socialist Republic of Vietnam*,
  85 Fed. Reg. 40,226 (Dep't Commerce July 6, 2020) ..........................................23–24

## Other Authorities

Import Admin., U.S. Dep't of Commerce, Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries, Policy Bulletin 05.1 (2005),
  *available at* https://enforcement.trade.gov/policy/bull05-1.pdf ...................................4

UNITED STATES COURT OF INTERNATIONAL TRADE
**Before the Honorable Jennifer Choe-Groves, Judge**

| | |
|---|---|
| NANJING DONGSHENG SHELF MANUFACTURING CO., LTD., | |
| *Plaintiff*, | |
| v. | |
| UNITED STATES, | Court No. 24-00085 |
| *Defendant*, | |
| and | |
| COALITION FOR FAIR RACK IMPORTS, | |
| *Defendant-Intervenor.* | |

## DEFENDANT-INTERVENOR'S OPPOSITION TO
## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Defendant-Intervenor Coalition for Fair Rack Imports ("Defendant-Intervenor" or "CFRI") respectfully submits this response in opposition to the motion for judgment on the agency record filed by Plaintiff Nanjing Dongsheng Shelf Manufacturing Co., Ltd. ("Plaintiff" or "Dongsheng") in the above-captioned action. Dongsheng contests the decision of the U.S. Department of Commerce ("Commerce") to deny Dongsheng a separate rate in the 2021–2022 administrative review of the antidumping duty order on certain steel racks and parts thereof from the People's Republic of China ("China").[1] As demonstrated below, however, Commerce's decision on this issue involved a straightforward application of the agency's regulations and longstanding procedural rules in nonmarket economy ("NME") antidumping duty proceedings.

---

[1] The brief accompanying Dongsheng's motion is hereinafter referred to as "Dongsheng Br." (ECF Nos. 24 and 25).

Indeed, contrary to Dongsheng's contentions, Commerce's decision to assign Dongsheng the China-wide entity rate instead of granting it a separate rate is supported by substantial evidence and in accordance with law. Therefore, CFRI respectfully requests that the Court deny Dongsheng's motion for judgment on the agency record and enter judgment sustaining the final results of the review.

## STATEMENT PURSUANT TO RULE 56.2(c)

### I.    Administrative Determination Under Review

The administrative determination under review is Commerce's final results in the 2021–2022 administrative review of the antidumping duty order on certain steel racks and parts thereof from China. *See Certain Steel Racks and Parts Thereof from the People's Republic of China*, 89 Fed. Reg. 25,235 (Dep't Commerce Apr. 10, 2024) (P.R. 263) ("*Final Results*"), and accompanying Issues and Decision Memorandum (P.R. 262) ("IDM").[2]

### II.    Issues Presented for Appeal

1.    Whether Commerce lawfully rejected Dongsheng's separate rate certification, which was filed seven days after the applicable deadline.

2.    Whether Commerce erred when it selected respondents for individual examination from the pool of companies that timely submitted separate rate applications and certifications.

3.    Whether Commerce's decision to assign Dongsheng the China-wide entity rate is supported by substantial evidence and in accordance with law.

---

[2] Citations to the public record documents are designated as "P.R." and citations to the confidential record documents containing business proprietary information are designated as "C.R." Although CFRI cites to confidential record documents to aid the Court in its review, this brief does not contain any business proprietary information.

## BACKGROUND AND PROCEDURAL HISTORY

I.  **Commerce's Court-Approved Policy of Establishing a Single Rate for the China-Wide Entity and the Rebuttable Presumption of Government Control**

The antidumping law authorizes Commerce to establish individual dumping margins for specific entities and an "all-others" dumping margin for other entities that have not been individually examined. *See* 19 U.S.C. § 1673d(c)(1)(B)(i)(I)–(II). Although this statute applies only to investigations in market economy proceedings, Commerce employs similar methods when determining dumping margins in proceedings involving NME countries such as China. *See Albemarle Corp. v. United States*, 821 F.3d 1345, 1352 and n.6 (Fed. Cir. 2016). As part of its methods for NME countries, Commerce determines a single dumping margin for all entities within the NME country (commonly referred to as the NME country-wide or NME-wide entity rate). *See* 19 C.F.R. § 351.107(d).[3] The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has ruled that the "country-wide NME entity rate may be an 'individually investigated' rate within the meaning of 19 U.S.C. § 1673d(c)(1)(B)(i)(I)." *China Manufacturers Alliance, LLC v. United States*, 1 F.4th 1028, 1039 (Fed. Cir. 2021).

The NME country-wide entity rate is established in the original investigation. *Id.* Following the investigation, Commerce does not revisit the NME country-wide entity rate unless an interested party specifically requests, or Commerce self-initiates, an administrative review of the NME entity. *See Antidumping Proceedings: Announcement of Change in Department*

---

[3] During the pendency of this appeal, Commerce codified various aspects of its practice regarding the determination of rates in NME antidumping proceedings. *See Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws*, 89 Fed. Reg. 101,694 (Dep't Commerce Dec. 16, 2024) ("*2025 Preamble*"). Although several provisions in the regulations were amended, including Section 351.107, the revisions did not change Commerce's NME policy. As was the case before the rulemaking, the NME-wide entity rate recognizes that "legally distinct entities are in a sufficiently close relationship to the government to be considered part of a single entity (*i.e.*, the government controlled entity)." *2025 Preamble*, 89 Fed. Reg. at 101,699.

*Practice for Respondent Selection and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 Fed. Reg. 65,963, 65,969–970 (Dep't Commerce Nov. 4, 2013). The Federal Circuit has upheld Commerce's policy of treating an NME country as a single entity and carrying forward the individual rate for the NME entity in subsequent administrative reviews. *See, e.g.*, *China Manufacturers Alliance*, 1 F.4th at 1038–40; *Diamond Sawblades Manufacturers Coalition v. United States*, 866 F.3d 1304, 1312–15 (Fed. Cir. 2017).

Commerce also has a policy of applying a rebuttable presumption that all exporters and producers within an NME country are subject to government control. *See* Import Admin., U.S. Dep't of Commerce, Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries, Policy Bulletin 05.1 (2005), *available at* https://enforcement.trade.gov/policy/bull05-1.pdf (last visited January 25, 2025). To overcome this presumption and obtain a "separate rate," a respondent must demonstrate the absence of both *de jure* and *de facto* government control over export activities. *Id.* The NME country-wide rate is the default rate assigned to those respondents that fail to demonstrate their independence from the government. *See SolarWorld Americas, Inc. v. United States*, 234 F. Supp. 3d 1286, 1294–1303 (Ct. Int'l Trade 2017). Critically, a respondent's separate rate status must be established "in each segment of the proceeding in which the party is involved because a company's corporate structure, ownership, or relationship with the government can change from one segment of a proceeding to the next." *Id.* The Federal Circuit has upheld the rebuttable presumption that all exporters within an NME country are under the state's control. *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997).[4]

---

[4] The NME policies described above were recently codified in Commerce's regulations. *See* 19 C.F.R. §§ 351.107, 351.108 (2025); *see also 2025 Preamble*, 89 Fed. Reg. at 101,697–101,705, 101,757–101,760.

II.    **The Less-Than-Fair-Value Investigation and the First Three Administrative Reviews of the Antidumping Duty Order**

In the original antidumping investigation on imports of certain steel racks and parts thereof from China, Dongsheng submitted a separate rate application and was selected for individual examination as a mandatory respondent. *See Certain Steel Racks and Parts Thereof from the People's Republic of China*, 84 Fed. Reg. 35,595 (Dep't Commerce July 24, 2019). Dongsheng received a dumping rate of 18.06 percent, which was also assigned to the thirty other exporters that were eligible for a separate rate. *Id.* at 35,596–597. Commerce applied the petition margin of 144.50 percent as the China-wide entity rate. *Id.* at 35,597. Thereafter, on September 16, 2019, Commerce published the antidumping duty order. *See Certain Steel Racks and Parts Thereof from the People's Republic of China*, 84 Fed. Reg. 48,584 (Dep't Commerce Sept. 16, 2019).

Since the publication of the order, Commerce has completed three administrative reviews (the most recent of which is at issue in this action). The China-wide entity has not been reviewed and, as a result, the same rate established in the investigation continues to apply to companies considered to be part of the China-wide entity. In the first two administrative reviews covering the 2019–2020 and 2020–2021 periods, Dongsheng timely submitted its separate rate certification and received a separate rate. *See Certain Steel Racks and Parts Thereof from the People's Republic of China*, 87 Fed. Reg. 20,817, 20,818 (Dep't Commerce Apr. 8, 2022), *as amended*, 87 Fed. Reg. 33,711 (Dep't Commerce June 3, 2022); *Certain Steel Racks and Parts Thereof from the People's Republic of China*, 88 Fed. Reg. 21,179, 21,180 (Dep't Commerce Apr. 10, 2023), *as amended*, 88 Fed. Reg. 41,074 (Dep't Commerce June 23, 2023). Commerce followed its NME policy in each of these reviews, denying separate rate treatment to the companies that failed to rebut the presumption of government control.

**III.    Commerce's Rejection of Dongsheng's Untimely Separate Rate Certification and Decision to Assign Dongsheng the China-Wide Entity Rate in the *Final Results***

**A.    Commerce's Initiation of the Administrative Review**

On November 3, 2022, based on requests from interested parties, Commerce initiated a review of the antidumping duty order covering 12 companies (including Dongsheng) for the 2021–2022 period. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 66,275, 66,278–279 (Dep't Commerce Nov. 3, 2022) ("*Initiation Notice*").[5] As was the case for the first two reviews, the *Initiation Notice* announced important guidelines and deadlines for the 2021–2022 administrative review. Commerce reminded interested parties of its NME policy and provided the standard deadline for respondents to submit their separate rate information, *i.e.*, within 30 days of the *Initiation Notice*. *Id.* at 66,276. There was no exception for respondents that were previously awarded a separate rate, as Commerce explained: "{I}n order to demonstrate separate rate eligibility, Commerce requires entities for whom a review was requested, that were assigned a separate rate in the most recent segment of this proceeding in which they participated, to certify that they continue to meet the criteria for obtaining a separate rate." *Id.* Commerce also impressed upon respondents the importance of complying with the separate rate information deadline, stating that "{e}xporters and producers must file a timely Separate Rate Application or Certification if they want to be considered for respondent selection." *Id.*

**B.    The Filing of Separate Rate Applications and Certifications**

Pursuant to the *Initiation Notice*, respondents had until December 5, 2022 to submit a separate rate application or certification. Certain respondents timely requested and were granted

---

[5] Commerce inadvertently omitted one of the 12 companies from the *Initiation Notice*, which was later corrected. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 88 Fed. Reg. 50 (Dep't Commerce Jan. 3, 2023).

a one-week extension that allowed them to submit separate rate information by December 12, 2022. *See* Commerce Extension Memoranda, P.R. 36–38 (Dec. 2, 2022). Commerce expressly stated that the extended deadline was only applicable to the individual respondents that requested an extension, *i.e.*, Ningbo Xinguang Rack Co., Ltd. ("Xinguang"), Jiangsu JISE Intelligent Storage Equipment Co., Ltd. ("JISE"), Jiangsu Nova Intelligent Logistics Equipment Co., Ltd. ("Nova"), and Suntop (Xiamen) Display System Inc. ("Suntop").

Unlike the four other respondents noted above, Dongsheng never requested an extension of the December 5, 2022 deadline that was established in the *Initiation Notice*. Thus, it was still subject to that deadline. However, Dongsheng missed the deadline and filed its separate rate certification seven days late on December 12, 2022. *See* Dongsheng Separate Rate Certification, P.R. 45 and C.R. 24 (Dec. 12, 2022). In accordance with its regulations, Commerce rejected Dongsheng's separate rate certification and removed the filing from the record because it was untimely. *See* Rejection of Dongsheng's Separate Rate Certification, P.R. 62 (Jan. 17, 2023) ("First Rejection Letter").

### C.    Commerce's Selection of Respondents for Individual Examination

Shortly after initiating the review, Commerce released U.S. Customs and Border Protection ("CBP") entry data for respondent selection purposes. *See* Automated Commercial System Shipment Query, P.R. 18 and C.R. 1 (Nov. 18, 2022); Second Automated Commercial System Shipment Query, P.R. 42 and C.R. 8 (Dec. 9, 2022). Although Commerce initiated the review with respect to a total of 12 companies, a fewer number of companies were included in the pool of potential mandatory respondents. Commerce did not consider companies for which all review requests were withdrawn, companies that certified they had no shipments of subject merchandise, and companies that did not timely submit separate rate information. *See* Respondent Selection at 3, P.R. 64 and C.R. 28 (Jan. 13, 2023). Dongsheng was not considered

as a potential mandatory respondent because it did not timely submit its separate rate

certification. *Id.* at 3. Commerce selected Xinguang and Suntop as mandatory respondents. *Id.* at

6.[6]

> **D.      Commerce's Denial of Dongsheng's Belated Request to Accept its Untimely**
> **Separate Rate Certification and Preliminary Decision to Assign Dongsheng**
> **the China-Wide Entity Rate**

On January 25, 2023, Dongsheng requested that Commerce accept its untimely separate

rate certification and select Dongsheng as a mandatory respondent. *See* Request to Accept

Separate Rate Certification, P.R. 74 (Jan. 25, 2023). Dongsheng's counsel stated that it missed

the deadline because it was under the false impression that the deadline for separate rate

information had been extended for *all* respondents and that Commerce's extension was not

limited to the specific respondents that requested an extension.

CFRI opposed Dongsheng's request because Commerce acted in accordance with its

rules that govern the rejection of untimely filed material and because Dongsheng did not

demonstrate the existence of any extraordinary circumstance that warranted consideration of

Dongsheng's belated request. *See* Comments Opposing Dongsheng's Request, P.R. 80 (Feb. 2,

2023) ("CFRI Opposition Letter"). As part of its submission, CFRI included materials that

showed the respondent-specific extensions granted in this administrative review were consistent

with the manner in which Commerce had granted extensions in the investigation of this

proceeding and in other proceedings. *Id.* at Exhibit 1 and Exhibit 2. CFRI also demonstrated that

Dongsheng's other arguments were baseless because they asked Commerce to consider factors

---

[6] Thereafter, Commerce received a complete voluntary response from Nova, which Commerce selected
for individual examination after all requests to review one of the two originally selected mandatory
respondents (*i.e.*, Suntop) were withdrawn. *See* Examination of Voluntary Respondent, P.R. 126 (June 6,
2023). During the course of the review, Commerce individually examined Xinguang and Nova.

that were not relevant under the specific regulation that governs the treatment of untimely filings. *Id.* at 6–14.

Dongsheng filed a reply in support of its request and was granted an *ex parte* meeting with Commerce officials in charge of the administrative review to discuss the circumstances surrounding the late separate rate certification. *See* Dongsheng's Response to Petitioner's Comments Regarding Separate Rate Certification, P.R. 88 (Feb. 8, 2023); Meeting with Counsel for Dongsheng, P.R. 93 (Feb. 16, 2023). Counsel for Dongsheng also represented Xinguang, a respondent that timely requested an extension of time and met the deadline to submit its separate rate information. *See* Meeting with Counsel for Dongsheng at 1, P.R. 93 (Feb. 16, 2023). During the *ex parte* meeting, when asked why counsel requested additional time for Xinguang and not for Dongsheng, "{c}ounsel responded that it only submitted requests for its clients that needed an extension of the … {separate rate certification} deadline{}." *Id.* at 2.

On March 2, 2023, Commerce issued a letter denying Dongsheng's request to reconsider the rejection of its untimely separate rate certification. *See* Decision Not to Reconsider Rejection of Dongsheng's Separate Rate Certification Submission, P.R. 108 (Mar. 2, 2023) ("Second Rejection Letter"). Commerce methodically dismissed each of Dongsheng's arguments, explaining that the rejection was in accordance with the agency's regulations that govern this precise situation. Commerce also noted that Dongsheng's request for reconsideration was not an out-of-time extension request. *Id.* at 2. However, even if Dongsheng had submitted such a request, Commerce explained that Dongsheng did not satisfy the "extraordinary circumstance" standard in the regulations that would have justified a retroactive extension of time to accept the late filing. *Id.* Subsequently, Dongsheng filed a voluntary response to Section A of the initial questionnaire, which Commerce rejected and removed from the record as unsolicited because

Dongsheng was no longer eligible for respondent selection after it failed to submit a timely separate rate certification. *See* Rejection of Dongsheng's Response to Section A, P.R. 175 (Aug. 18, 2023).

Because Dongsheng did not timely submit its separate rate certification, Dongsheng failed to rebut the presumption of government control and was preliminarily treated as part of the China-wide entity. *See Certain Steel Racks and Parts Thereof from the People's Republic of China*, 88 Fed. Reg. 69,612, 69,613 (Dep't Commerce Oct. 6, 2023) (P.R. 220). The China-wide entity was not under review. Therefore, Commerce preliminarily assigned Dongsheng the China-wide entity rate from the original investigation. *Id.*

### E.    Commerce's *Final Results*

On April 10, 2024, after considering interested parties' administrative case and rebuttal briefs, Commerce published the final results and continued to find that Dongsheng was not eligible to receive a separate rate. *See Final Results*, 89 Fed. Reg. at 25,236. Commerce maintained its position that accepting Dongsheng's untimely separate rate certification would have been contrary to the regulation governing untimely filed material, would have raised concerns regarding procedural fairness due to nonuniform application and enforcement of the agency's rules, and would have placed an additional burden on the agency and its ability to meet its deadlines. *See* IDM at 24–26. Commerce disagreed with Dongsheng that prior cases dictated that Commerce should have accepted the untimely separate rate certification under these circumstances. *Id.* at 26–30. Commerce also did not waver on its decision to reject Dongsheng's voluntary Section A response because Dongsheng's failure to submit a timely separate rate certification meant that the company was not eligible to be selected for individual examination, whether as a mandatory or voluntary respondent. *Id.* at 30–31. Because Dongsheng did not take

the necessary steps to qualify for a separate rate, Commerce revoked Dongsheng's separate rate

status and assigned Dongsheng the China-wide entity rate in the *Final Results*.

## ARGUMENT

### I.    Standard of Review

The standard of review requires that the Court sustain any determination, finding, or

conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or

otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The substantial evidence

standard requires "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial

evidence is "more than a mere scintilla," but "less than the weight of the evidence." *Altx, Inc. v.

United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004). The substantial evidence standard requires

the Court to assess whether the administrative determination under review is reasonable given

the record as a whole. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed.

Cir. 2006).

Commerce's determination is in accordance with law if it has met all constitutional,

statutory, regulatory, and procedural requirements. *See Huvis Corp. v. United States*, 525 F.

Supp. 2d 1370, 1374 (Ct. Int'l Trade 2007) (citing *FCC v. NextWave Pers. Commc'ns, Inc.*, 537

U.S. 293, 300 (2003)). "'Absent constitutional constraints or extremely compelling

circumstances{,} the administrative agencies should be free to fashion their own rules of

procedure and to pursue methods of inquiry capable of permitting them to discharge their

multitudinous duties.'" *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1351

(Fed. Cir. 2015) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435

U.S. 519, 543 (1978)). Administrative reviews of antidumping duty orders are subject to strict

statutory deadlines. *See* 19 U.S.C. § 1675(a)(3)(A). The Court should not "intrude{} upon

11

Commerce's power to apply its own procedures for the timely resolution of antidumping reviews," even if the Court is of the belief "that properly excluded evidence would yield a more accurate result if the evidence were considered." *PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751, 761 (Fed. Cir. 2012). It is thus within Commerce's authority to establish and enforce time limits in administrative reviews by rejecting untimely submissions. *See Dongtai Peak Honey Indus. Co.*, 777 F.3d at 1351.[7]

## II.    Commerce's Rejection of Dongsheng's Untimely Filed Separate Rate Certification Was Lawful

In this case, Commerce performed a straightforward application of the regulation that directs the agency to reject untimely filed material and enforced the procedural rules associated with the agency's court-approved NME policy. The *Initiation Notice* instructed respondents regarding the deadlines that NME exporters and producers must meet to obtain a separate rate instead of being assigned the NME country-wide rate. *See Suntec Indus. Co. v. United States*, 857 F.3d 1363, 1370–71 (Fed. Cir. 2017). Dongsheng was listed in the *Initiation Notice* as one of the companies subject to the administrative review. Commerce announced that within 30 days all companies (including Dongsheng) were required to submit a separate rate application or certification to overcome the rebuttable presumption of government control. *See Initiation Notice*, 87 Fed. Reg. at 66,275–276. The 30-day deadline fell on a weekend and was automatically extended to the next business day pursuant to 19 C.F.R. § 351.303(b)(1). As a result, companies had until December 5, 2022—a total of 32 days after initiation—to submit their separate rate information.

---

[7] CFRI notes that the substantial evidence standard of review section in Dongsheng's brief is wholly inapplicable to this case because it discusses the "best available information" standard when selecting surrogate values—an aspect of Commerce's NME methodology that is not at issue. *See* Dongsheng Br. at 2–3.

Commerce's regulations authorize the agency to exercise its discretion to grant timely submitted extension requests for good cause. *See* 19 C.F.R. § 351.302(b). During the review, Commerce received timely requests to extend the deadline to submit separate rate information from *certain* companies and granted those requests:

- On November 28, 2022, counsel for Xinguang requested a two-week extension to file a separate rate application.[8] *See* Xinguang Extension Request, P.R. 28 (Nov. 28, 2022). In response, Commerce granted "Xinguang an extension to file its separate rate application, until no later than 5:00 p.m. Eastern Time on December 12, 2022." Xinguang Separate Rate Application Extension Memorandum, P.R. 36 (Dec. 2, 2022). There is no mention of Dongsheng in both Xinguang's request and Commerce's memorandum granting the extension for Xinguang.

- On November 28, 2022, JISE and Nova requested a two-week extension to file their separate rate information. *See* JISE and Nova Extension Request, P.R. 29 (Nov. 29, 2022). Notably, the request asked that Commerce extend the deadline for all parties. *Id.* (requesting "a two week extension for the filing of SRAs and SRCs by all parties in this matter"). *Id.* In response, however, Commerce was clear that it was only granting "JISE and Nova an extension until no later than 5:00 p.m. Eastern Time on December 12, 2022, to file their separate rate certification/separate rate application." JISE and Nova Separate Rate Application and Certification Extension Memorandum, P.R. 37 (Dec. 2, 2022).

- On December 1, 2022, Suntop requested a one-week extension to submit its separate rate application. *See* Suntop Extension Request, P.R. 35 (Dec. 1, 2022). In response, Commerce granted "Suntop an extension until no later than 5:00 p.m. Eastern Time on December 12, 2022, to file its separate rate application." Suntop Separate Rate Application Extension Memorandum, P.R. 38 (Dec. 2, 2022).

The extensions of time that Commerce granted were specific to the four respondents that timely requested an extension and established good cause, *i.e.*, Xinguang, JISE, Nova, and Suntop. Dongsheng neither requested nor received an extension of time but still filed its separate rate certification on December 12, 2022—seven days after the deadline established in the *Initiation Notice*.

---

[8] As mentioned earlier in the Background and Procedural History section, Xinguang and Dongsheng were represented by the same counsel. *See* deKieffer & Horgan Entry of Appearance and APO Application, P.R. 13–14 (Nov. 8, 2022).

The courts have long held that "Commerce has broad discretion to establish its own rules governing administrative procedures, including the establishment and enforcement of time limits." *Yantai Timken Co. v. United States*, 521 F. Supp. 2d 1356, 1370 (Ct. Int'l Trade 2007); *see also Dongtai Peak Honey Indus. Co.*, 777 F.3d at 1351 (quoting *Vt. Yankee Nuclear Power Corp.*, 435 U.S. at 543). Commerce promulgated regulations through notice-and-comment rulemaking that establish rules and procedures governing the rejection of untimely filed materials. *See Coal. for Common Sense in Gov't Procurement v. Sec'y of Veterans Affairs*, 464 F.3d 1306, 1317 (Fed. Cir. 2006) (explaining that rules formally adopted through notice-and-comment procedures have the force and effect of law). Commerce's regulations provide that untimely filed or unsolicited material "will" be rejected. *See* 19 C.F.R. § 351.302(a). The regulations thus *require* Commerce to reject untimely submissions. *See Roberts v. United States*, 745 F.3d 1158, 1165 (Fed. Cir. 2014) (characterizing the word "will" as mandatory rather than permissive). The same section of the regulations further states that Commerce "will not consider or retain in the official record of the proceeding" any "{u}ntimely filed factual information, written argument, or other material that the Secretary rejects." 19 C.F.R. § 351.302(d)(1)(i).

Pursuant to its regulations and well-established practice in this and other proceedings, Commerce "reject{ed} Dongsheng's {separate rate certification} because it was untimely filed." First Rejection Letter at 1. There is no reason to overturn this decision. Indeed, this Court has previously sustained Commerce's practice to assign respondents the NME country-wide rate when they do not take care to meet deadlines related to establishing their separate rate status. *See Repwire LLC v. United States*, 628 F. Supp. 3d 1288, 1291–94 (Ct. Int'l Trade 2023), *appeal docketed*, No. 2023-1933 (Fed. Cir. May 22, 2023); *see also Jinko Solar Imp. and Exp. Co. v. United States*, 701 F. Supp. 3d 1367, 1375–1378 (Ct. Int'l Trade 2024). In this regard,

14

Dongsheng's appeal is very similar to *Repwire*, which involved a challenge to the final results in a review of the antidumping duty order on aluminum wire and cable from China. The plaintiff in *Repwire*, like Dongsheng, failed to submit its separate rate information by the deadline that Commerce established in the initiation notice. *Repwire*, 628 F. Supp. 3d at 1290. Commerce initially selected the company as a mandatory respondent and issued the initial antidumping questionnaire but less than two weeks later rescinded the questionnaire because it realized the respondent had not timely submitted its separate rate information. *Id.* at 1290–91. As a result, Commerce declined to accept the respondent's questionnaire responses and assigned the respondent the China-wide entity rate. *Id.* at 1291. The Court sustained Commerce's determination in full because, "{w}hile Commerce's erroneous issuance and subsequent recission of the questionnaire was unfortunate," Commerce's court-approved NME policy dictates how respondents may obtain a separate rate and "Commerce was reasonable in assessing the China-wide entity rate in light of {plaintiff's} failure to demonstrate its independence from government control." *Id.* at 1293–94. There is no reason why Dongsheng should be treated any different than the plaintiff in *Repwire*.

## III. Dongsheng Fails to Demonstrate that Commerce Was Legally Required to Accept Dongsheng's Untimely Separate Rate Certification

### A. Dongsheng's Separate Rate Certification Was Filed After the Deadline and the Reason for the Late Filing Does Not Constitute an Extraordinary Circumstance

The Court should reject Dongsheng's argument that Commerce deviated from an established practice of extending the deadline for separate rate certifications for all parties whenever it grants such an extension. *See* Dongsheng Br. at 5. There is no such uniform agency practice upon which Dongsheng could reasonably rely. *See Mid Continent Steel & Wire, Inc. v. United States*, 203 F. Supp. 3d 1295, 1312 (Ct. Int'l Trade 2017) (explaining that agency action

becomes practiced "when a uniform and established procedure exists that would lead a party, in the absence of notification of change, reasonably to expect adherence to the established practice or procedure"). In fact, the history of this proceeding shows that Commerce extended the separate rate certification deadline only for those specific parties that submitted a timely request and not for all parties simultaneously. *See* CFRI Opposition Letter at Exhibit 2 (compilation of letters from the investigation granting only the requestor(s) an extension). Commerce took the same approach in the instant review, granting extensions that applied specifically only to Xinguang, JISE, Nova, and Suntop. As Commerce explained, Dongsheng's claim in this regard is "without merit" because Commerce "identified the companies to which the extension applied." IDM at 25.

Dongsheng disputes Commerce's position that although Dongsheng asked Commerce to accept the untimely separate rate certification, Dongsheng never formally requested an extension after missing the December 5, 2022 deadline. *See* Dongsheng Br. at 8; *see also* IDM at 24 (referencing 19 C.F.R. § 351.302(c), which requires extension requests to be in the form of a "separate, stand-alone submission"). This point is moot, because Commerce explained that even had Dongsheng made a formal request for an extension, the circumstances here did not justify granting a retroactive extension. *See* IDM at 24 n.124. Commerce's regulations provide that "{a}n untimely filed extension request will not be considered unless the party demonstrate that an extraordinary circumstance exists." 19 C.F.R. § 351.302(c). An "extraordinary circumstance" is "an unexpected event" that "{c}ould not have been prevented if reasonable measures had been taken" and "{p}recludes a party or its representative from timely filing an extension request through all reasonable means." *Extension of Time Limits*, 78 Fed. Reg. 57,790, 57,793 (Dep't Commerce Sept. 20, 2013). Commerce has explained that "{e}xamples of extraordinary

circumstances include a natural disaster, riot, war, force majeure, or medical emergency" and "{e}xamples that are unlikely to be considered extraordinary circumstances include insufficient resources, inattentiveness, or the inability of a party's representative to access the Internet on the day on which the submission was due." *Id.* at 57,791.

Before the Court, Dongsheng states it missed the deadline solely due to a calendaring error because counsel mistakenly believed the deadline was extended for all respondents. *See* Dongsheng Brief at 5. Dongsheng's careless reading of *three* clearly written extension letters, including one that was issued to a company that is represented by the same counsel as Dongsheng, is the type of inattentiveness that does not qualify as an extraordinary circumstance as it could have been prevented if reasonable measures had been taken. For example, counsel to Dongsheng could have consulted with a Commerce official to obtain clarification or additional guidance regarding the deadline for Dongsheng to submit its separate rate certification. Instead, Dongsheng relied on its own erroneous understanding of the extension letters that ignored the actual text and did not attempt to take corrective action until after the deadline had already passed. Commerce was therefore correct when it stated that "not being aware of the need to file an extension request and failing to meet a filing deadline, in and of itself, is not an 'extraordinary circumstance.'" IDM at 24 n.124.

In an apparent concession that the extraordinary circumstance standard was not met, Dongsheng pivots and argues that Commerce's strict enforcement of its deadline amounted to an abuse of discretion. *See* Dongsheng Br. at 8–15. However, this Court should not order Commerce to ignore the specific regulation that was promulgated to address this precise situation and establishes a standard for deciding whether to accept an untimely filing from an interested party. In fact, it is a fundamental principle of administrative law that "an agency must abide by its own

regulations." *Fort Stewart Schools v. Federal Labor Relations Authority*, 495 U.S. 641, 654 (1990); *see also Torrington Co. v. United States*, 82 F.3d 1039, 1049 (Fed. Cir. 1996) ("Commerce, like other agencies, must follow its own regulations."). The express language in 19 C.F.R. § 351.302(c) provides that when Commerce receives an untimely extension request, it will consider the request and potentially exercise its discretion to extend the deadline for good cause only if the extraordinary circumstance requirement is satisfied. In other words, before Commerce can even consider an untimely extension request, the requestor must meet its burden and demonstrate the existence of an extraordinary circumstance. Dongsheng could not meet this requirement. Commerce adhered to its regulations and did not abuse its discretion when it denied Dongsheng's untimely request.

> **B.    Contrary to Dongsheng's Assertions, Decisions of This Court and the Federal Circuit Recognize Commerce's Authority to Enforce its Deadline and Support Commerce's Rejection of Dongsheng's Untimely Separate Rate Certification**

There is no merit to Dongsheng's claim that Commerce should have waived the deadline and accepted Dongsheng's untimely separate rate certification based on prior court decisions. *See* Dongsheng Br. at 8–15. None of the court decisions cited by Dongsheng mandate a different result in this case. As it did before Commerce, Dongsheng relies heavily on the Court's decision in *Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 815 F. Supp. 2d 1342 (Ct. Int'l Trade 2012). *See* Dongsheng Br. at 9–11. Dongsheng refers to *Grobest* as "a foundational case," *id.* at 9, but Dongsheng's reliance on that decision is misplaced. As Commerce explained, *Grobest* involves a prior version of Commerce's regulation, which did not contain the requirement to demonstrate the existence of an extraordinary circumstance as a condition to Commerce's consideration of an untimely extension request. *See* IDM at 29. The Court has dismissed similar arguments relying on *Grobest* for the same reason. *See Trinity Manufacturing, Inc. v. United*

*States*, 549 F. Supp. 3d 1370, 1378–79 (Ct. Int'l Trade 2021), *aff'd*, Appeal No. 2022-1329, 2023 WL 234228 (Fed. Cir. Jan. 18, 2023).

In fact, the previous version of the regulation did not address untimely extension requests at all. Commerce amended the regulation through notice-and-comment procedures in September 2013 and intended to "adhere strictly" to the heightened extraordinary circumstance requirement to avoid the various problems that the agency encountered prior to the rulemaking. *See Extension of Time Limits*, 78 Fed. Reg. at 57,791–792. The *Grobest* decision also predates the precedential decision issued by the Federal Circuit in *Dongtai Peak Honey Indus. Co.*, which upheld Commerce's rejection of an untimely filing under the previous version of the regulation because it is fully within the agency's discretion to set and enforce its deadlines. *See* 777 F.3d at 1350–53. In light of the amendment to 19 C.F.R. § 351.302(c) and the Federal Circuit's decision in *Dongtai Peak Honey Indus. Co.*, the *Grobest* decision has minimal precedential value and is not the standard that should govern the Court's review in this case.

Dongsheng argues that the *Grobest* decision continues to have relevance today, referencing three decisions that, as demonstrated below, are inapposite. Dongsheng Brief at 9–10. In *Grupo Acerero S.A. de C.V. v. United States*, the Court reviewed Commerce's denial of a *timely extension request* (based on COVID-related difficulties and the tragic deaths of key personnel) and concluded that Commerce abused its discretion by treating the two mandatory respondents differently for no legitimate reason. *See generally* 698 F. Supp. 3d 1320 (Ct. Int'l Trade 2024). Here, Dongsheng never timely requested an extension and was not treated differently than any other respondent. Indeed, another respondent missed the deadline in the underlying review and, like Dongsheng, also received the China-wide entity rate. *See Final Results*, 89 Fed. Reg. at 25,236 (denying separate rate for Nanjing Ironstone Storage Equipment

19

Co., Ltd.). In *Matra Americas, LLC v. United States*, the Court merely referenced the *Grobest* decision when it stated that Commerce is entitled to broad discretion in establishing and enforcing procedural requirements (including deadlines) and ultimately did not address the merits of the plaintiff's challenge to Commerce's rejection of its case brief. *See* 681 F. Supp. 3d 1339, 1349–50 and 1365–66 (Ct. Int'l Trade 2024). Finally, in *Ferrostaal Metals Gmbh v. United States*, the Court disagreed with the plaintiff that *Grobest* was persuasive authority and ultimately upheld Commerce's rejection of the plaintiff's quantity and value questionnaire responses because "Commerce has a strong interest to ensure that its regulations are followed." 518 F. Supp. 3d 1357, 1371–72 (Ct. Int'l Trade 2021). Nothing in these cases indicates that *Grobest* is the appropriate analytical framework to review Commerce's rejection of untimely filed materials.

Dongsheng also erroneously relies on the decision in *Celik Halat ve Tel Sanayi A.S. v. United States*, arguing that Commerce abuses its discretion when it enforces the extraordinary circumstance requirement in a way that imposes a "draconian" penalty. *See* Dongsheng Br. at 10 (citing 557 F. Supp. 3d 1348, 1361–62 (Ct. Int'l Trade 2022)). The facts here are distinguishable, as Commerce aptly found:

> In the segment of the proceeding underlying *Celik Halat*, Commerce rejected the respondent's response to sections B and C of the questionnaire because it filed one exhibit 21 minutes after the 5:00 pm EST deadline. Here, by contrast, Dongsheng Shelf's failure did not stem from a minor technical violation (*e.g.*, submitting a portion of its SRC 21 minutes after the 5:00pm EST deadline on December 5, 2022); Dongsheng Shelf submitted its entire SRC seven days after the deadline without a request for an extension.

IDM at 26–27. In addition, it would have been futile for the plaintiff in *Celik* to timely file an extension because Commerce definitively stated in a previous extension letter that it would not grant any further requests. In contrast, Dongsheng made no attempt to file its separate rate certification in a timely manner, and Commerce did not limit Dongsheng's ability to submit a

timely extension request. The fact that Commerce granted extensions of time to other companies under review demonstrates that timely requesting an extension would not have been futile.

The Court should also reject Dongsheng's attempt to analogize the facts of this case with the decision in *Cambria Co. v. United States*, 705 F. Supp. 3d 1369 (Ct. Int'l Trade 2024). *See* Dongsheng Br. at 14–15. In *Cambria*, the Court held that Commerce abused its discretion in rejecting a respondent's supplemental questionnaire response because Commerce did not express any reasonable basis for setting a deadline of 10 a.m. instead of 5 p.m. *See* 705 F. Supp. 3d at 1377–79. The Court found that Commerce had a codified practice of 5 p.m. deadlines on the day that a filing is due and departed from that practice. If not for the 10 a.m. deadline, the response would have been timely, because it was filed before 5 p.m. Dongsheng asserts that "the basic principles" in *Cambria* are relevant here because Dongsheng's counsel "made an inadvertent calendar error and presumed that the extension for {separate rate certifications} applied to all parties." Dongsheng Br. at 14. However, unlike the respondent in *Cambria*, Dongsheng's presumption regarding the applicable deadline was not grounded in any agency practice. As discussed above, Commerce does not have an established practice of extending the deadline for separate rate information for all parties simultaneously when a single respondent requests and receives an extension. Just as it did in the prior segments in this proceeding, Commerce granted extensions only to the respondents that timely submitted a request. Commerce did not deviate from its standard practice in this case. Therefore, Dongsheng's reliance on *Cambria* is misplaced.[9]

---

[9] Dongsheng cites various other decisions, *see* Dongsheng Br. at 13–14, which Commerce explained were distinguishable from the facts of this case. *See* IDM at 28–29.

### C.    Dongsheng's Remaining Arguments Do Not Undermine Commerce's Rejection of Dongsheng's Untimely Separate Rate Certification

Dongsheng argues that there are other case-specific reasons why Commerce should have accepted Dongsheng's untimely separate rate certification, such as the burden with accepting the untimely filing, the seven-day timeframe after the deadline the untimely filing was made, the respondent's cooperation in prior segments of the proceeding, the significance of the untimely filing, and the proportionality of the consequence. *See* Dongsheng Br. at 10–18. In essence, Dongsheng turns the regulation on its head and inappropriately attempts to place the burden on Commerce to demonstrate the reasonableness of its decision based on factors that are not relevant to 19 C.F.R. § 351.302(c). This argument must fail because consideration of factors other than the applicable legal standard for accepting untimely filed materials (*i.e.*, extraordinary circumstances) would amount to arbitrary and capricious agency action. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The Court has rejected similar arguments that attempt to supplant the extraordinary circumstance standard with a different rule. *See Jinko Solar*, 701 F. Supp. 3d at 1375–1378.

Even though accepting Dongsheng's untimely filing was not allowed by the regulations, Dongsheng complains that Commerce's decision was unfair and downplays the burdens associated with accepting late separate rate certifications. However, Commerce is charged with administering the antidumping law and has the authority to establish and enforce the time limits in its proceedings. *See Dongtai Peak Honey Indus. Co.*, 777 F.3d at 1351. Pursuant to this authority, Commerce added the extraordinary circumstance requirement more than ten years ago through notice-and-comment rulemaking procedures to establish a uniform standard for the acceptance of untimely filings. *See* IDM at n.122. Commerce explained that a "hallmark of fairness" is strict adherence to rules and procedures because it creates certainty and predictability

22

for all parties. *Id.* at 25. Dongsheng treats its noncompliance as harmless error because it filed its separate rate certification on the same day as other respondents. *See* Dongsheng Br. at 11. But unlike Dongsheng, these other respondents were careful to comply with the rules by timely requesting and receiving an extension.[10] Dongsheng has not addressed why notions of fairness should permit Dongsheng to ignore its own duty as a respondent, ride on the coattails of other respondents, and receive the benefit of an extension that Dongsheng's counsel admitted was never actually needed. With respect to the burden on the agency, Commerce explained that making an exception for Dongsheng would set a dangerous precedent and jeopardize Commerce's ability to meet its own statutory deadlines. *See* IDM at 25–26. The Court should not "intrude{} upon Commerce's power to apply its own procedures for the timely resolution of antidumping reviews." *PSC VSMPO-Avisma Corp.*, 688 F.3d at 761.

Dongsheng further contends that Commerce's decision was arbitrary because it accepted late filings in other cases, but all five cases identified by Dongsheng are distinguishable from this one. *See* Dongsheng Br. at 16–17. The first three cases were issued before 2013 and involved the prior version of the regulation. *See* IDM at 30. The fourth case issued in 2018 also does not support Dongsheng's position because, as Dongsheng acknowledges, Commerce ultimately did not accept the late filing in that case. *See* Dongsheng Br. at 17. The fifth and final case issued in 2015 involved the so-called "second chance" rule, which has since been expressly disavowed by Commerce. In *Utility Scale Wind Towers from the Socialist Republic of Vietnam*, Commerce stated that "Commerce does not have a 'second chance' policy and strictly enforces its deadlines in order to meet its statutory deadlines, as required by section 351.302(d) of Commerce's

---

[10] For example, Nanjing Kingmore Logistics Equipment Manufacturing Co., Ltd. ("Kingmore"), like Dongsheng, never requested an extension. But Kingmore understood that the deadline of December 5, 2022 applied to it and filed its separate rate certification on the correct date.

regulations." 85 Fed. Reg. 40,226 (Dep't Commerce July 6, 2020), and accompanying Issues and Decision Memorandum at Comment 1. Commerce explained that while there "are some past instances … in which Commerce has accepted certain late filings resulting from mistakes by a law firm," such instances do not constitute a policy or practice that is binding on Commerce. *Id.* Well before Dongsheng made its late filing in the underlying review at issue here, Commerce had clearly stated its intent to "adhere strictly to its regulations, and apply them uniformly across all cases." That is exactly what Commerce has done here.

Dongsheng also takes issue with the fact that Commerce itself has failed to meet court deadlines in a number of cases where the late filings were ultimately accepted by the Court. *See* Dongsheng Br. at 17–18. Decisions of the Court to accept late filings from Commerce are not relevant to the issue at hand. Agencies and Article III courts are each authorized to fashion their own rules of procedure to carry out their respective duties based on the discretion afforded to them to manage their respective caseloads. The Court's standard for accepting late filings (*i.e.*, excusable neglect) is not the same as the standard applied by Commerce in its proceedings (*i.e.*, extraordinary circumstances). The Court's application of its own rules has no bearing on Commerce's authority to enforce its deadlines and regulatory requirements, especially given the extremely complicated litigation docket that the agency manages, which requires a stricter standard than the court to ensure that the agency can meet its own statutorily mandated deadlines.

## IV.    Commerce Lawfully Excluded Dongsheng from Consideration as a Potential Mandatory Respondent or Voluntary Respondent

In the *Initiation Notice*, Commerce stated that it intended to select mandatory respondents based in part on CBP entry data. *See* 87 Fed. Reg. at 66,275. However, in NME antidumping proceedings, Commerce only considers respondents eligible for individual examination as

24

mandatory respondents when they have timely demonstrated their separate rate status. Commerce put all respondents (including Dongsheng) on notice regarding this aspect of its NME practice in the *Initiation Notice*, which explained that "{e}xporters and producers must file a timely Separate Rate Application or Certification if they want to be considered for respondent selection." 87 Fed. Reg. at 66,276. Consistent with this agency practice and the *Initiation Notice*, Dongsheng was not considered as a potential mandatory respondent because it failed to timely submit a separate rate certification. *See* Respondent Selection at 3.

Contrary to Dongsheng's arguments, Commerce also properly excluded the company as a voluntary respondent, even though Dongsheng accounted for the largest volume of subject merchandise during the period of review. *See* Dongsheng Br. at 18–20. Approximately one month after its separate rate certification was rejected, Dongsheng filed a response to Section A of the initial questionnaire. Commerce rejected this response because any potential voluntary respondent is "subject to the same requirements as an exporter or producer initially selected … for individual examination." Rejection of Dongsheng's Response to Section A. In its rejection letter, Commerce explained that, consistent with19 C.F.R. § 351.204(d)(2), "{a} party which fails to cooperate with the Department's process for mandatory respondent selection purposes cannot be considered for voluntary respondent treatment." *Id.*   For these reasons, Commerce found that Dongsheng's Section A response was unsolicited material that must be rejected pursuant to 19 C.F.R. § 351.302(d).

Commerce's approach does not violate the statute's instructions for respondent selection in 19 U.S.C. § 1677f-1(c)(2). Companies that do not timely file their separate rate information, such as Dongsheng, are considered part of the China-wide entity. Because no review was requested for the China-wide entity, Commerce could not select the companies comprising the

China-wide entity, including Dongsheng, as a mandatory respondent. Thus, contrary to Dongsheng's assertions, it was not a "fact" on the record that it would be one of the mandatory respondents, because it did not satisfy the requirements to be eligible for individual examination.

Dongsheng diminishes the importance of the filing of a separate rate certification and argues that the Section A response is what Commerce truly relies upon when it individually examines a respondent. *See* Dongsheng Br. at 19. This argument incorrectly presumes that Dongsheng should have been selected as a mandatory respondent, which is not the case. As discussed above and as Commerce found, Dongsheng cannot dictate the terms and conditions for separate rate status. *See* IDM at 25 (citing *Bebitz Flanges Works Pvt. Ltd. v. United States*, 433 F. Supp. 3d 1297, 1305 (Ct. Int'l Trade 2020)). Additionally, any potential voluntary respondent must timely submit a *complete* response to all sections of the initial questionnaire by the date specified for the companies initially selected as mandatory respondents. *See PrimeSource Building Prods., Inc. v. United States*, 111 F.4th 1320, 1325 (Fed. Cir. 2024) (citing 19 U.S.C. § 1677m(a)). Dongsheng submitted a voluntary response to Section A only in an effort to obtain a separate rate. The voluntary respondent provisions of the statute cannot be used as an end run around the NME policy. In *Repwire*, this Court sustained the rejection of a response to the initial questionnaire as unsolicited material when the respondent did not timely submit its separate rate information. *See* 628 F. Supp. 3d at 1292–93. For the same reason, the Court should sustain Commerce's rejection of Dongsheng's voluntary Section A response.

Dongsheng claims that Commerce's decision to exclude Dongsheng from consideration for individual examination was arbitrary because Commerce previously has selected mandatory respondents without first requiring the timely filing of a separate rate application or certification. *See* Dongsheng Br. at 19–20. Dongsheng references two cases: the first case is the antidumping

investigation on paper file folders from China and the second case is the antidumping investigation on cast iron soil pipe from China. The circumstances of those two cases are totally different because they were investigations, and unlike the underlying review at issue here, the China-wide entity was being examined in the two investigations. The initiation notices in the two investigations stated Commerce's intent to select mandatory respondents based on responses to quantity and value questionnaires. *See Cast Iron Soil Pipe from the People's Republic of China*, 83 Fed. Reg. 8,053, 8,056 (Dep't Commerce Feb. 23, 2018); *Paper File Folders from the People's Republic of China, India, and the Socialist Republic of Vietnam*, 87 Fed. Reg. 67,441 (Dep't Commerce Nov. 8, 2022). In contrast, the *Initiation Notice* in the underlying review imposed additional requirements to be eligible for individual examination (*i.e.*, the timely submission of separate rate information) because the China-wide entity was not under review and its rate was not subject to change.

## V.    Commerce's Decision to Assign Dongsheng the China-Wide Entity Rate Is Supported By Substantial Evidence and In Accordance With Law

Under Commerce's NME policy, respondents must rebut the presumption of government control to obtain a separate rate and avoid being assigned the China-wide entity. *See Diamond Sawblades Manufacturers Coalition*, 866 F.3d at 1311. By not timely filing a separate rate certification, Dongsheng failed to comply with Commerce's procedural requirements and did not rebut the presumption of government control. Therefore, Commerce treated Dongsheng as part of the China-wide entity and assigned Dongsheng the 144.50 percent China-wide entity rate.

Dongsheng contends that assigning it the China-wide entity rate was tantamount to the application of adverse facts available, which was not authorized here because "Dongsheng has always cooperated with {Commerce's} deadlines in the past and even in this very review." *See* Dongsheng Br. at 21–22. However, Commerce unequivocally stated that it did not assign the

China-wide entity rate to Dongsheng pursuant to its authority to apply adverse facts available

under 19 U.S.C. § 1677e(b). Commerce's decision to assign Dongsheng the China-wide entity

rate is not contrary to law, even if it is viewed as a facts available determination. In *Prime Time*

*Commerce LLC v. United States*, the Court rejected a similar challenge to the China-wide entity

rate when the respondent failed to rebut the presumption of government control:

> Commerce did not, as Prime Time contends, rely on {adverse facts available} to
> choose the PRC-wide entity's rate. The PRC-wide entity's rate was already
> established. Commerce's use of facts available in this review relates solely to
> Homey's failure to rebut the presumption that it is part of the PRC-wide entity.
> The rebuttable presumption applicable in the NME-context sets the NME-entity
> rate as the default rate. If a party fails to rebut the presumption of government
> control, it remains part of the NME-entity and is assigned the default NME-entity
> rate. In the final determination, Commerce determined that Homey was not
> eligible for a separate rate because it failed to respond to Commerce's Section A
> Questionnaire, as was required of it as a mandatory respondent. One can view
> Commerce's application of the established PRC-wide rate to Homey, by virtue of
> Homey failing to rebut the presumption of control as a facts available
> determination or a facts available determination with an adverse inference. Either
> way, it was Homey's burden to rebut the presumption. Commerce continued to
> consider Homey to be part of the PRC-wide entity and, therefore, it assigned
> Home the established PRC-wide-rate.

396 F. Supp. 3d 1319, 1333 (Ct. Int'l Trade 2019), *aff'd*, Appeal No. 2021-1783, 2022 WL

2313968 (Fed. Cir. June 28, 2022).

Dongsheng's cooperation with separate rate procedures in the past is irrelevant. *See*

Dongsheng Br. at 22–23. Commerce does not rely on a respondent's separate rate eligibility in a

prior segment of the proceeding as evidence of the respondent's eligibility in subsequent

segments. *See SolarWorld Americas, Inc.*, 234 F. Supp. 3d at 1296. Dongsheng failed to timely

establish its eligibility for separate rate status. Indeed, the Federal Circuit has addressed similar

arguments regarding the adverse nature of the NME country-wide entity rate and stated the

following: "The fact that a country-wide rate may have been calculated using {adverse facts

available} does not change its applicability to a NME entity that cooperated, but ultimately failed

to qualify for a separate rate." *Diamond Sawblades Manufacturers Coalition*, 866 F.3d at 1312.

When Commerce determines the China-wide entity rate on the basis of AFA in a prior segment,

it "logically requires Commerce to apply the same AFA-based rate to all members of the {China-

wide} entity that have not proven their independence from the state." *Id.* at 1313 (citing

*Transcom, Inc. v. United States*, 294 F.3d 1371, 1381 (Fed. Cir. 2002)). Dongsheng cannot

"sidestep{} the core principle underlying the NME presumption." *Id.*

The Court should also reject Dongsheng's claim that the China-wide entity rate "bears no

relationship to Dongsheng's anticipated margins." Dongsheng Br. at 24. Commerce has no

obligation to demonstrate that an assigned rate reflects an alleged commercial reality of the

interested party. *See* 19 U.S.C. § 1677e(d)(3). The Court has also said that, in this context, it

"will not 'set aside application of a proper administrative procedure because it believes that

properly excluded evidence would yield a more accurate result if the evidence were

considered.'" *Jinko Solar*, 701 F. Supp. 3d at 1377–78 (quoting *PSC VSMPO-Avisma Corp.*, 688

F.3d at 761). The Court in *Jinko Solar* went on to say that the respondent "lost its ability to argue

for the separate rate when it missed the deadline to return its {separate rate certification}." *Id.* at

1378. Dongsheng's argument lacks merit for the same reason.

The Federal Circuit's recent decision in *Oman Fasteners LLC v. United States* does not

dictate that Commerce erred in assigning Dongsheng the China-wide entity rate. *Oman

Fasteners, LLC v. United States*, No. 2023-1661, 2025 WL 37898, at *1 (Fed. Cir. Jan. 7, 2025).

In that case, which involved an antidumping proceeding for a market economy rather than an

NME, Commerce applied total adverse facts available and assigned a rate of 154.33 percent to a

respondent that missed a filing deadline for a supplemental questionnaire response by 16

minutes. *Id.* The Federal Circuit held that this represented "a gross departure from the established

principle that Commerce, when applying the adverse-inference provision, must pursue accuracy, with any departure limited to what is needed to deter non-compliance with Commerce rules and orders." *Id.* at *11. In reaching this conclusion, the Federal Circuit explained that Commerce's discretionary authority to apply adverse facts available "must be exercised within the constraints of the statute and record" and referenced 19 U.S.C. § 1677e(d)(2), which requires Commerce to assign a dumping margin based on an evaluation of the situation that caused it to resort to adverse facts available. *Id.* Putting aside the fact that Dongsheng missed its relevant deadline by a full seven days rather than a mere 16 minutes, Commerce did not invoke 19 U.S.C. § 1677e(b) and apply adverse facts available to Dongsheng in the final results. Rather, Commerce simply assigned Dongsheng the China-wide entity rate based on its failure to timely establish its eligibility for a separate rate. Because Commerce did not apply adverse facts available to Dongsheng, *Oman Fasteners LLC* does not undermine Commerce's decision to assign Dongsheng the China-wide entity rate.

Dongsheng blames Commerce for "remov{ing} any ability for it to export to the U.S. pending this litigation." Dongsheng Br. at 10. However, Dongsheng is the one at fault because it missed a filing deadline even when, as it has conceded, it did not need any extension of that deadline. Although Dongsheng would prefer a different result, Commerce should not be faulted for adhering to its regulations and NME policy. Moreover, Dongsheng could have reclaimed separate rate status and obtained a different cash deposit rate by participating in the ongoing 2022–2023 administrative review. Instead, Dongsheng withdrew its review request and opted to retain the China-wide entity rate. *See Certain Steel Racks and Parts Thereof from the People's Republic of China*, 89 Fed. Reg. 82,213, 82,214 (Dep't Commerce Oct. 10, 2024) (rescinding review with respect to Dongsheng). Dongsheng cannot complain about its current ability to

30

access the U.S. market and the perceived "Draconian penalty" when it missed the deadline to maintain its separate rate status for the 2021–2022 period and then made the deliberate decision to keep the China-wide entity rate for its future entries.

Finally, Dongsheng states in a footnote that Commerce's enforcement of the extraordinary circumstances standard is arbitrary and capricious because it "seems to only fall on exporters and the respondents' bar" and that "{t}here is no comparable risk or penalty for the petitioners' bar." Dongsheng Br. at 23 n.10. There is no truth to this statement. For example, the Court and the Federal Circuit have upheld Commerce's strict application of 19 C.F.R. § 351.302(c) where domestic interested parties' failure to submit a timely substantive response or extension request at the outset of a sunset review resulted in revocation of the antidumping duty order on chloropicrin from China. *See Trinity Manufacturing, Inc.*, 549 F. Supp. 3d at 1378–79, *aff'd*, Appeal No. 2022-1329, 2023 WL 234228 (Fed. Cir. Jan. 18, 2023). Commerce is evenhanded when it enforces its deadlines and the decision in *Trinity Manufacturing, Inc.* is proof that Commerce does not relax procedural requirements for petitioners when an early deadline is missed. There is no harsher consequence for a petitioner than revocation of an order. On the other hand, respondents that receive the China-wide entity rate could limit its impact to a single year of entries by complying with Commerce's separate rate procedures and demonstrating independence from government control in the next administrative review.

In any event, the Court has recognized that "Commerce's failure to apply {its} rules {regarding deadlines} with Procrustean consistency in every case does not deprive it of the authority to enforce those rules in any case." *Stupp Corp. v. United States*, 5 F.4th 1341, 1350–51 (Fed. Cir. 2021). Dongsheng falls short of a showing that Commerce's enforcement of its

procedural rules is "so haphazard or unreasonable as to be arbitrary or capricious" such that its final results must be overturned. *Id.*

## CONCLUSION

For the foregoing reasons, CFRI respectfully requests that the Court deny the plaintiff's motion for judgment on the agency record and sustain Commerce's final results as supported by substantial evidence and in accordance with law.

Respectfully submitted,

/s/ Roger B. Schagrin
Roger B. Schagrin
Luke A. Meisner
Saad Y. Chalchal*
Schagrin Associates
900 Seventh St. N.W. Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel for the Coalition on Fair Rack Imports*

Date: January 28, 2025

*Admitted only in New York and New Jersey. Practice limited to matters before federal courts and agencies.

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief contains 9,731 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

Dated: January 28, 2025                          <u>/s/ Roger B. Schagrin</u>
                                                 Roger B. Schagrin

UNITED STATES COURT OF INTERNATIONAL TRADE
Before the Honorable Jennifer Choe-Groves, Judge

| | |
|---|---|
| NANJING DONGSHENG SHELF MANUFACTURING CO., LTD., <br><br> *Plaintiff,* <br><br> *v.* <br><br> UNITED STATES, <br><br> *Defendant,* <br><br> *and* <br><br> COALITION FOR FAIR RACK IMPORTS, <br><br> *Defendant-Intervenor.* | Court No. 24-00085 |

## <u>ORDER</u>

Upon consideration of the motion for judgment on the agency record filed by the plaintiff, the responses thereto filed by the defendant and the defendant-intervenor, the plaintiff's reply, the administrative record, all other papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that plaintiff's motion for judgment on the agency record is **DENIED**; it is further

**ORDERED** that the U.S. Department of Commerce's final results in the third administrative review of the antidumping duty order on certain steel racks and parts thereof from the People's Republic of China are sustained; it is further

**ORDERED** that judgment is entered in favor of the United States; and it is further

**ORDERED** that the subject entries shall be liquidated in accordance with the final court decision, including all appeals, as provided for in section 516A(e) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(e).

**SO ORDERED**.

_____
Honorable Jennifer Choe-Groves, Judge
U.S. Court of International Trade

Dated: _____, 2025
        New York, New York