A-570-088
Remand Redetermination
Slip Op. 25-76
POR: 09/01/2021 – 08/31/2022
**Public Document**
E&C/OIV:  KH

***Nanjing Dongsheng Shelf Manufacturing Co., Ltd., et al v. United States,***
**Court No. 24-00085, Slip Op. 25-76 (CIT June 16, 2025)**
***Certain Steel Racks and Parts Thereof from the People's Republic of China***

**FINAL RESULTS OF REDETERMINATION
PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT or the

Court) issued in *Nanjing Dongsheng Shelf Manufacturing Co., Ltd., et al v. United States*, Court

No. *24-00085*, Slip Op. 25-76 (CIT June 16, 2025) (*Remand Order*).[1]  This action arises out of

the administrative review of the antidumping duty (AD) order on certain steel racks and parts

thereof from the People's Republic of China (China) covering the period of review (POR)

September 1, 2021, through August 31, 2022 (2021-2022 AD AR).  Based on the *Remand Order*,

in these final results of remand, we have revised the final results of the 2021-2022 AD AR[2] by

treating Nanjing Dongsheng Shelf Manufacturing Co., Ltd. (Dongsheng) as a mandatory

respondent, granting it a separate rate, and calculating an estimated weighted-average dumping

margin for the company of 25.00 percent.

---

[1] *See Nanjing Dongsheng Shelf Manufacturing Co., Ltd., v. United States*, 781 F. Supp. 3d 1374 (CIT 2025)
(*Remand Order*).
[2] *See Certain Steel Racks and Parts Thereof from the People's Republic of China: Final Results of Antidumping
Duty Administrative Review and Final Determination of No Shipments; 2021–2022*, 89 FR 25235 (April 10, 2024)
(*Final Results*), and accompanying Issues and Decision Memorandum (IDM).

## II.     BACKGROUND

In the underlying review, Dongsheng filed an untimely Separate Rate Certification (SRC) which Commerce rejected, pursuant to 19 CFR 351.302(d).[3]  In response to Dongsheng's request that Commerce reconsider its decision to reject the company's SRC,[4] Commerce continued to reject Dongsheng's SRC because it was untimely.[5]  Dongsheng also requested that it be selected as a mandatory or voluntary respondent.[6]  Because Dongsheng did not comply with Commerce's respondent selection requirements by timely filing an SRC, Commerce did not select Dongsheng as a mandatory respondent or consider it as a voluntary respondent.

In the *Final Results*, Commerce calculated dumping margins of 11.44 percent and 26.90 percent for the mandatory respondents Jiangsu Nova Intelligent Logistics Equipment Co., Ltd. and the collapsed entity Ningbo Xinguang Rack Co., Ltd. /Ningbo Jiabo Rack Co., Ltd. / Ningbo Lede Hardware Co., Ltd (Xinguang Rack), respectively.  Commerce assigned a separate rate of 12.73 percent to two non-individually examined companies to which it granted separate rates.[7]  Commerce also found that two companies made no shipments of subject merchandise during the POR.[8]  Furthermore, Commerce denied Dongsheng a separate rate and treated it as part of the China-wide entity.[9]

The CIT found that Commerce's decision not to consider Dongsheng as a mandatory respondent because it untimely filed its SRC was not in accordance with law.  The CIT noted that

---

[3] *See Certain Steel Racks and Parts Thereof from the People's Republic of China: Preliminary Results and Partial Rescission of the Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2021-2022*, 88 FR 69612 (October 6, 2023) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM) at 13; *see also* Commerce's Letter, "Rejection of Nanjing Dongsheng Shelf Manufacturing Co., Ltd.'s Separate Rate Certification," dated January 17, 2023 (Dongsheng SRC Rejection).
[4] *See* Dongsheng's Letter, "Request to Accept SRC and Select as Mandatory Respondent," dated January 25, 2023 (Dongsheng's Request).
[5] *See* Dongsheng's Letter "Dongsheng Pre-Preliminary Comments," dated September 15, 2023.
[6] *See* Dongsheng's Request.
[7] *See Final Results*, 89 FR at 25236.
[8] *Id*.
[9] *Id*.

where it is not practicable to make individual weighted-average dumping margin determinations because of the large number of exporters or producers involved in a review, the statute provides that Commerce may determine weighted-average dumping margins for a reasonable number of exporters or producers by limiting its examination to, among other things, exporters and producers accounting for the largest volume of the subject merchandise from the exporting country that can be reasonably examined.[10]  The CIT pointed out that record information indicates that Dongsheng was the largest exporter of subject merchandise during the POR.[11]  According to the CIT, "Commerce cannot impose a regulatory limitation {(regulations setting forth filing deadlines)} on the selection of mandatory respondents that produces a result inconsistent with the express requirements of the statute."[12]  Moreover, the CIT noted that Dongsheng filed its SRC only a week late and at the same time that other respondents who received filing extensions filed their separate rate applications (SRA) or SRCs.[13]  Finally, the CIT found that Commerce inappropriately deviated from the statutory language when selecting mandatory respondents because it based respondent selection on the value, rather than the volume, of subject merchandise shipments during the POR, as required by statute.[14]  Therefore, the CIT remanded the matter to Commerce to "reconsider the selection of mandatory respondents in accordance with {its} Opinion."[15]

As discussed below, in this remand redetermination, pursuant to the Court's *Remand Order*, Commerce accepted Dongsheng's SRC.[16]  Upon accepting the SRA, Commerce then treated Dongsheng as a mandatory respondent and issued its AD and Double Remedies

---

[10] *See Remand Order*, 781 F.Supp.3d at 1379.
[11] *Id*. at 1380.
[12] *Id*. at 1379.
[13] *Id*. at 1380.
[14] *Id*.
[15] *Id*.
[16] *See* Dongsheng's Letter, "SRC," dated October 3, 2025 (SRC).

Questionnaires to Dongsheng.[17]  In October 2025, Dongsheng responded to Commerce's AD Questionnaire and submitted a SRC.[18]  In December 2025, Dongsheng responded to Commerce's Double Remedies Questionnaire.[19]  On December 11, 2025, the Coalition for Fair Rack Imports (the petitioner) submitted comments on Dongsheng's DQR.[20]

From December 2025 through February 2026, we issued supplemental questionnaires to, and received timely responses thereto from, Dongsheng.[21]  On December 31, 2025, Commerce requested surrogate value (SV) information from interested parties for certain factors of production (FOPs) used by Dongsheng.[22]  On January 8, 2026, the petitioner and Dongsheng submitted SV data.[23]  On January 14, 2026, the petitioner submitted rebuttal SV data.[24]

On February 9, 2026, we released the Draft Remand and provided interested parties with an opportunity to comment.[25]  On February 13, 2026, we received comments on the Draft

---

[17] *See* Commerce's Letters, "Request for Information," dated September 16, 2025 (AD Questionnaire); and "Double Remedies Questionnaire," dated December 5, 2025 (Double Remedies Questionnaire).

[18] *See* Dongsheng's Letters "Section A Questionnaire," dated October 3, 2025 (AQR); "Section C Questionnaire Response," dated October 24, 2025 (CQR); and "Section D Questionnaire Response," dated October 31, 2025 (DQR); *see also* SRC.

[19] *See* Dongsheng's Letter "Double Remedy Questionnaire Response," dated December 19, 2025 (Double Remedies Response).

[20] *See* Petitioner's Letter "Submission of New Factual Information to Rebut, Clarify, or Correct Nanjing Dongsheng Shelf Manufacturing Co., Ltd.'s Section D Response," dated December 11, 2025.  The petitioner is the Coalition for Fair Rack Imports.

[21] *See* Commerce's Letters, "Sections A, C and D Supplemental Questionnaire," dated December 10, 2025 (December 10, 2025 Supplemental Questionnaire); "Section D Supplemental Questionnaire," dated December 23, 2025 (December 23, 2025 Supplemental Questionnaire); "Second Section D Supplemental Questionnaire," dated January 26, 2026 (January 26, 2026 Supplemental Questionnaire); and "Third Section D Supplemental Questionnaire," dated February 4, 2026.  *See also* Dongsheng's Letters, "Supplemental Questionnaire Response," dated December 22, 2025 (December 22, 2025 SQR); "Supplemental Questionnaire Response," dated January 6, 2026 (January 6, 2026 SQR); "Supplemental Questionnaire Response," dated February 3, 2026 (February 3, 2026 SQR); and "Supplemental Questionnaire Response," dated February 6, 2026.

[22] *See* Memorandum, "Request for Surrogate Value Data," dated December 31, 2025 (Request for SV Data).

[23] *See* Dongsheng's Letter, "Surrogate Values," dated January 8, 2026 (Dongsheng SV Data); *see also* Petitioner's Letter, "Petitioner's Submission of Factual Information to Value Factors of Production," dated January 8, 2026 (Petitioner SV Data).

[24] *See* Petitioner's Letter, "Petitioner's Surrogate Value Rebuttal Comments," dated January 14, 2026.

[25] *See* Draft Results of Redetermination Pursuant to Court Remand, *Nanjing Dongsheng Shelf Manufacturing Co., Ltd., et al v. United States*, Court No. 24-00085, Slip Op. 25-76 (CIT June 16, 2025), dated February 9, 2026 (Draft Remand).

Remand from the petitioner.[26]  We have responded to those comments below.  No other party, including Dongsheng, submitted comments.

After considering the comments raised by the petitioner, we denied Dongsheng a by-product offset.  As a result, the final estimated weighted-average dumping margin for Dongsheng is 25.00 percent.[27]

## III.    ANALYSIS

As noted above, the CIT remanded the *Final Results* to Commerce to "reconsider the selection of mandatory respondents in accordance with {its} Opinion."[28]  Therefore, consistent with the Court's *Remand Order* and given that Commerce has accepted Dongsheng's SRC and that Dongsheng is the only remaining firm subject to review whose entries remain unliquidated,[29] we have determined to select Dongsheng as a mandatory respondent.  Accordingly, as explained below, in this remand, we treated Dongsheng as a mandatory respondent, granted it a separate rate, examined its submitted sales and FOP information, and calculated a weighted-average dumping margin for the company.[30]  In doing so, we have satisfied the Court's *Remand Order* in which it found that Commerce improperly denied Dongsheng an opportunity for a review.

---

[26] *See* Petitioner's Letter, "Petitioner's Comments on Draft Results of Redetermination Pursuant to Court Remand, dated February 13, 2026 (Petitioner Remand Comments).

[27] *See* Memorandum, "Calculation Memorandum for the Final Results of Redetermination for Nanjing Dongsheng Shelf Manufacturing Co., Ltd. for the 2021-2022 Administrative Review," dated concurrently with these final results of redetermination (Final Results Analysis Memorandum).

[28] *See Remand Order*.

[29] *See* customs instructions at ACCESS barcodes 4636631-01, 4597928-01, 4597921-01, 4597918-01, and 4597917-01.

[30] Because Dongsheng is the only respondent that is party to this litigation, we have not revised the dumping margin assigned in the *Final Results* to the non-individually examined companies to which we granted a separate rate.

## IV.    DISCUSSION OF METHODOLOGY

### A.  Non-Market Economy Country

In the underlying review, Commerce considered China to be a non-market economy

(NME) country.[31]  In accordance with section 771(18)(C)(i) of the Tariff Act of 1930, as

amended (the Act), a determination that a foreign country is an NME shall remain in effect until

revoked by the administering authority.  We have continued to treat China as an NME country

for purposes of this remand and calculated normal value (NV) using a FOP methodology in

accordance with section 773(c) of the Act, which applies to an NME country.

### B.  Separate Rates

In a proceeding involving an NME country, Commerce maintains a rebuttable

presumption that all companies are subject to government control and, thus, should be assessed a

single weighted average dumping margin unless the company can affirmatively demonstrate an

absence of government control, both in law (*de jure*) and in fact (*de facto*), with respect to its

exports (*i.e.*, can affirmatively demonstrate that it is eligible for a separate rate).[32]  Commerce

considers the following *de jure* criteria in determining whether an individual company may be

granted a separate rate:  (1) an absence of restrictive stipulations associated with an individual

exporter's business and export licenses; (2) any legislative enactments decentralizing control of

companies; and (3) any other formal measures by the government decentralizing control of

companies.[33]  Commerce considers the following factors in evaluating whether a respondent is

---

[31] *See Preliminary Results*, 88 FR at 69612, 69613, unchanged in *Final Results*.
[32] *See Notice of Final Determination of Sales at Less Than Fair Value, and Affirmative Critical Circumstances, In Part: Certain Lined Paper Products from the People's Republic of China*, 71 FR 53079, 53082 (September 8, 2006); *see also Final Determination of Sales at Less Than Fair Value and Final Partial Affirmative Determination of Critical Circumstances: Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 FR 29303, 29307 (May 22, 2006).
[33] *See Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China*, 56 FR 20588, 20589 (May 6, 1991).

subject to *de facto* government control of its export activities: (1) whether export prices (EP) are set by, or are subject to the approval of, a government agency; (2) whether the respondent has authority to negotiate and sign contracts and other agreements; (3) whether the respondent has autonomy from the government in making decisions regarding the selection of management; and (4) whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses.[34]

Dongsheng submitted information pertaining to its eligibility for a separate rate in its SRC and AQR. In accordance with Commerce's practice, we analyzed whether Dongsheng demonstrated the absence of *de jure* and *de facto* government control over its export activities.

The evidence provided by Dongsheng supports a finding of the absence of *de jure* government control over its export activities because it shows: (1) there is an absence of restrictive stipulations associated with its business and export licenses; (2) there are applicable legislative enactments decentralizing control over the export activities of companies; and (3) there are other formal measures by the government decentralizing control over the export activities of companies.[35] Further, we find that the evidence supports a finding of the absence of *de facto* government control over Dongsheng's export activities because it shows: (1) the company set its own export prices independent of the government and without the approval of a government authority; (2) the company has authority to negotiate and sign contracts and other agreements; (3) the company has autonomy from the government in making decisions regarding

---

[34] *See Notice of Final Determination of Sales at Less Than Fair Value: Silicon Carbide from the People's Republic of China*, 59 FR 22585, 22587 (May 2, 1994) (*Silicon Carbide from China*); *see also Notice of Final Determination of Sales at Less Than Fair Value: Furfuryl Alcohol from the People's Republic of China*, 60 FR 22544 (May 8, 1995).
[35] *See* SRC; *see also* AQR.

the selection of management; and (4) there is no restriction on the company's use of export revenue, the disposition of profits, or financing of losses.[36]

Therefore, Commerce finds, for purposes of these final results of redetermination, that Dongsheng qualifies for a separate rate under the criteria established in *Sparklers from China* and *Silicon Carbide from China*, based on the current record evidence.[37]

### C.  Surrogate Country

In the underlying review, Commerce selected Romania as the primary surrogate country. Based on the facts on the record of the underlying review regarding potential surrogate countries, and our analysis of those facts, in this remand redetermination we have continued to use Romania as the primary surrogate country.[38]  Therefore, as explained in detail below, we used SV from Romania to value the FOP used by Dongsheng to produce the merchandise under consideration.

### D.  Date of Sale

In accordance with 19 CFR 351.401(i), Commerce will normally "use the date of invoice, as recorded in the exporter or producer's records kept in the normal course of business" as the date of sale unless a different date better reflects the date on which the material terms of sale (*e.g.*, price and quantity) are established.[39]  Furthermore, Commerce has a long-standing practice

---

[36] *Id.*
[37] *See Final Determination of Sales at Less Than Fair Value: Sparklers from the People's Republic of China*, 56 FR 20588 (May 6, 1991) (*Sparklers from China*); *see also Silicon Carbide from China*.
[38] *See Preliminary Results* PDM at 15-19, unchanged in *Final Results.*
[39] *See, e.g.*, *Notice of Final Determinations of Sales at Less Than Fair Value; Certain Cold-Rolled Flat-Rolled Carbon Quality Steel Products from Turkey*, 65 FR 15123 (March 21, 2000), and accompanying IDM at Comment 1.

of finding that, where shipment date precedes invoice date, shipment date better reflects the date on which the material terms of sale are established.[40]

Dongsheng reported the invoice date as the date of its sales of subject merchandise.[41] Because record evidence does not demonstrate that the material terms of sale were established on a date other than the invoiced date, and consistent with Commerce's practice, Commerce considered the invoice date to be the date of Dongsheng's U.S. sale for this remand redetermination, in accordance with 19 CFR 351.401(i).[42]

### E. Comparisons to Normal Value

Pursuant to section 773(a) of the Act and 19 CFR 351.414(c)(1) and (d), in order to determine whether Dongsheng sold subject merchandise at less than NV, Commerce compared the export price (EP) of Dongsheng's sales to NV as described in the "Export Price" and "Normal Value" sections of this memorandum.

1. *Comparison Method*

Pursuant to 19 CFR 351.414(c)(1), Commerce calculates a weighted-average dumping margin by comparing weighted-average normal values to weighted-average EPs (or constructed export prices (CEP)) (*i.e.*, the average-to-average method) unless the Secretary determines that another method is appropriate in a particular situation.  In a less-than-fair-value (LTFV) investigation, Commerce examines whether to compare weighted-average normal values with

---

[40] *See, e.g., Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 10670 (March 12, 2018), and accompanying PDM at 6-7, unchanged in *Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 32629 (July 13, 2018).
[41] *See* CQR at 20.
[42] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value and Negative Final Determination of Critical Circumstances: Certain Frozen and Canned Warmwater Shrimp from Thailand*, 69 FR 76918 (December 23, 2004), and accompanying IDM at Comment 10; *see also Allied Tube and Conduit Corp. v. United States*, 132 F.Supp.2d 1087, 1090-92 (CIT 2001) (upholding Commerce's rebuttable presumption that invoice date is the appropriate date of sale).

the EPs (or constructed EPs) of individual sales (*i.e.*, the average-to-transaction method) as an alternative comparison method using an analysis consistent with section 777A(d)(1)(B) of the Act. Although section 777A(d)(1)(B) of the Act does not strictly govern Commerce's examination of this question in the context of an administrative review, Commerce nevertheless finds that the issue arising under 19 CFR 351.414(c)(1) in an administrative review is, in fact, analogous to the issue in a LTFV investigation.[43]

In numerous investigations and administrative reviews, Commerce has applied a "differential pricing" analysis for determining whether application of the average-to-transaction method is appropriate in a particular situation, consistent with 19 CFR 351.414(c)(1) and section 777A(d)(1)(B) of the Act.[44] Commerce finds that the differential pricing analysis is instructive for purposes of examining whether to apply an alternative comparison method in this administrative review.

The differential pricing analysis used in these final results of redetermination examines whether there exists a pattern of prices for comparable merchandise that differ significantly among purchasers, regions, or time periods. The analysis evaluates all U.S. sales by purchaser, region and time period to determine whether a pattern of prices that differ significantly exists. If such a pattern is found, then the differential pricing analysis evaluates whether such differences can be taken into account when using the average-to-average method to calculate the weighted-average dumping margin. The analysis incorporates default group definitions for purchasers,

---

[43] *See Ball Bearings and Parts Thereof from France, Germany, and Italy:  Final Results of Antidumping Duty Administrative Reviews; 2010–2011*, 77 FR 73415 (December 10, 2012), and accompanying IDM at Comment 1; *see also Apex Frozen Foods Private Ltd. v. United States*, 37 F.Supp.3d 1286 (CIT 2014).

[44] *See, e.g., Xanthan Gum from the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 78 FR 33351 (June 4, 2013); *see also Steel Concrete Reinforcing Bar from Mexico:  Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances*, 79 FR 54967 (September 15, 2014); and *Welded Line Pipe from the Republic of Turkey:  Final Determination of Sales at Less Than Fair Value*, 80 FR 61362 (October 13, 2015).

regions, time periods, and comparable merchandise. Purchasers are based on the reported customer codes. Regions are defined using the reported destination code (*i.e.*, ZIP code) and are grouped into regions based upon standard definitions published by the U.S. Census Bureau. Time periods are defined by the quarter within the POR based upon the reported date of sale. For purposes of analyzing sales transactions by purchaser, region, and time period, comparable merchandise is defined using the product control number and all characteristics of the U.S. sales, other than purchaser, region, and time period, that Commerce uses in making comparisons between EP (or CEP) and normal value for the individual dumping margins.

In the first stage of the differential pricing analysis used here, the "price difference test" is applied to determine whether prices differ significantly.[45] For comparable merchandise, the price difference test examines whether the weighted-average net price to a given purchaser, region or time period is within two percent of the weighted average net price to all other purchasers, regions or time periods. If the weighted-average net price to the given purchaser, region or time period falls outside of the plus or minus two percent band around the weighted-average net price to all other purchasers, regions or time periods, then the prices to that given purchaser, region or time period are found to differ significantly and those sales to the given purchaser, region or time period pass the price difference test.

---

[45] In prior investigations and administrative reviews, Commerce used the Cohen's *d* test as part of the differential pricing analysis, but the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) recently held that it is unreasonable to use the Cohen's *d* test when the Cohen's *d* test is applied to data that do not satisfy the statistical assumptions of normal distribution, equal variances, and sufficiently numerous data. *See Marmen Inc. v. United States*, 134 F.4th 1334 (Fed. Cir. 2025) (*Marmen*); *see also Stupp Corp. v. United States,* 2025 U.S. App. LEXIS 9616 (Fed. Cir. 2025) (nonprecedential disposition) (*Stupp*). Subsequently, Commerce sought information and public comment regarding alternatives to the use of the Cohen's *d* test to define when prices differ significantly among purchasers, regions, and time periods, pursuant to section 777A(d)(1)(B)(i) of the Act. *See Alternatives to the Use of Cohen's d; Request for Comment*, 90 FR 21277 (May 19, 2025). Against this backdrop and in an effort to comply with the Federal Circuit's holdings, Commerce has discontinued the use of the Cohen's *d* test and has discontinued the use of the "mixed method" as a potential alternative comparison methodology.

Next, the "ratio test" assesses the extent of the significant price differences for all U.S. sales as measured by the price difference test. The ratio test calculates the ratio of the total value of sales that pass the price difference test to the total value of sales by the respondent in the United States during the POR. If 33 percent or less of the total value of sales passes the price difference test, then the results of the price difference and ratio tests do not support consideration of the average-to-transaction method. If more than 33 percent of the total value of U.S. sales passes the price difference test, then Commerce will find that a pattern of prices existed during the POR. Consequently, Commerce will examine whether there is a meaningful difference in the weighted-average dumping margins calculated using the standard average-to-average method and using the alternative average-to-transaction method.

If both tests in the first stage (*i.e.*, the price difference test and the ratio test) demonstrate the existence of a pattern of prices that differ significantly such that the average-to-transaction method could be considered, then in the second stage of the differential pricing analysis, Commerce examines whether using only the average-to-average method can account for such differences. In considering this question, Commerce examines whether using the average-to-transaction method yields a meaningful difference in the weighted-average dumping margin as compared to that resulting from the use of the average-to-average method. If the difference between the two calculations is meaningful, then this demonstrates that the average-to-average method cannot account for differences in the respondent's pricing behavior in the U.S. market, such as those observed in this analysis, and, therefore, use of the average-to-transaction method may be appropriate. A difference in the weighted-average dumping margins is considered meaningful if: (1) there is a 25 percent relative change in the weighted-average dumping margins between the average-to-average method and the average-to-transaction method where

both rates are above the *de minimis* threshold; or (2) the resulting weighted-average dumping margins between the average-to-average method and the average-to-transaction method move across the *de minimis* threshold.

2.    *Results of the Differential Pricing Analysis*

Commerce finds that 79.0 percent of the value of Dongsheng's U.S. sales pass the price difference test,[46] which confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods.  However, Commerce finds no meaningful difference between the weighted-average dumping margin calculated using the average-to-average method and the weighted-average dumping margin calculated using the average-to-transaction method.  Thus, Commerce is applying the average-to-average method to calculate the weighted-average dumping margin for Dongsheng.

**F.    U.S. Price**

1.    *Export Price*

In accordance with section 772(a) of the Act, EP is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States," as adjusted under section 772(c) of the Act.

In calculating Dongsheng's dumping margin, we based net U.S. prices on EPs because during the POR, Dongsheng sold subject merchandise before the date of importation to an unaffiliated party in the United States.[47]

---

[46] *See* Final Results Analysis Memorandum.
[47] *See* AQR at Exhibit A-1 (public version); *see also* CQR at 18.

     2.    *Value-Added Tax*

Commerce's practice in NME cases is to adjust EP (or CEP) for the amount of any unrefunded (irrecoverable) value-added tax (VAT), in accordance with section 772(c)(2)(B) of the Act.[48]  When an NME government imposes an export tax, duty, or other charges on subject merchandise, or on inputs used to produce subject merchandise, from which the respondent was not exempted, Commerce will reduce the respondent's sales prices that it uses to calculate EP and CEPs by the amount of the tax, duty or charge paid, but not rebated.[49]  Where the irrecoverable VAT is a fixed percentage of the sales price, the final step in deriving a tax neutral dumping comparison is to reduce the price when calculating EP or CEP by this fixed percentage.[50]

Commerce's methodology, as explained above and applied in this remand, incorporates two basic steps:  (1) determine the irrecoverable VAT on subject merchandise; and (2) reduce U.S. price by the amount determined in step one.

Dongsheng reported that it has fully recovered, or will recover, the VAT that it paid for certain inputs.[51]  Because there was no irrecoverable VAT, we did not adjust Dongsheng's sales prices for VAT.

### G.  Normal Value

Section 773(c)(1) of the Act provides that Commerce shall determine NV using an FOP methodology if the merchandise is exported from an NME country and the information does not permit the calculation of NV using home market prices, third country prices, or constructed value

---

[48] *See Methodological Change for Implementation of Section 772(c)(2)(B) of the Tariff Act of 1930, as Amended, In Certain Non-Market Economy Antidumping Proceedings*, 77 FR 36481 (June 19, 2012).
[49] *Id.*; *see also Chlorinated Isocyanurates from the People's Republic of China Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 FR 4875 (January 30, 2014), and accompanying IDM at Comment 5.A.
[50] *Id.*
[51] *See* CQR at 39-41.

under section 773(a) of the Act.  Consistent with, and for the reasons explained in, the underlying review, we used an FOP methodology to calculate Dongsheng's dumping margin in this remand.

In accordance with section 773(c) of the Act and 19 CFR 351.408(c)(1), we calculated the cost of FOPs by multiplying each of the reported per-unit FOP consumption quantities by the relevant publicly available SV. We summed the surrogate material cost and surrogate freight cost for transporting material inputs to Dongsheng to derive the total delivered cost of each material input used to produce the merchandise under consideration.   Specifically, we added a surrogate freight cost, where appropriate, to surrogate input values using the shorter of the reported distance from the domestic supplier to Dongsheng's factory or the distance from the nearest seaport to Dongsheng's factory.[52]

1.     *Factor Valuation Methodology*

When selecting SVs, we considered, among other factors, the quality, specificity, and contemporaneity of the SV data.[53]  An overview of the SVs that we used to calculate Dongsheng's weighted-average dumping margin is below.  Detailed descriptions of the SVs that we selected are in the Draft Remand SV Memorandum.[54]  As noted below, where Dongsheng used an input that Commerce valued using a surrogate in the underlying review, we used that same SV to value the input in this remand.[55]

---

[52] *See Sigma Corp. v. United States*, 117 F.3d. 1401, 1407-08 (Fed. Cir. 1997) (*Sigma*).
[53] *See, e.g.*, *Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Partial Affirmative Determination of Critical Circumstances*, 73 FR 40485 (July 15, 2008), and accompanying IDM at Comment 9.
[54] *See* Memorandum, "Draft Remand Surrogate Value Memorandum for Nanjing Dongsheng Shelf Manufacturing Co., Ltd. for the 2021-2022 Administrative Review," dated February 9, 2026 (Draft Remand SV Memorandum).
[55] *See* Memorandum, "Preliminary Surrogate Value Memorandum," dated September 29, 2023 (Preliminary SV Memorandum).

a.    *Direct and Packing Materials*

Consistent with the underlying review, we valued direct and packing materials using Romanian import data from Eurostat.  Eurostat import prices are broad market averages, product-specific, tax-exclusive, and contemporaneous with the POR.[56]

Pursuant to section 773(c)(5) of the Act and Commerce's longstanding practice, we disregarded import prices if we had reason to believe or suspect that they may be subsidized prices.[57]  Commerce previously found it appropriate to disregard the prices of goods imported from India, Indonesia, Thailand, and the Republic of Korea (Korea) because it determined that these countries maintain broadly-available, non-industry specific export subsidies.[58]  Based on the existence of these subsidy programs that were generally available to all exporters and producers in these countries during the POR, it is reasonable to infer that all exporters in India, Indonesia, Thailand, and Korea may have benefitted from subsidies.  Therefore, we have not used the prices of goods from these countries that were imported into Romania during the POR when calculating Romanian import-based SVs.  Additionally, we have not used the prices of goods from NME and "unidentified" countries that were imported into Romania during the POR when calculating Romanian import based SVs.[59]  We disregarded imports from "unidentified"

---

[56] *See Preliminary Results* PDM at 28; *see also* Draft Remand SV Memorandum.

[57] *See* section 505 of the Trade Preferences Extension Act of 2015, Pub. Law 114-27 (June 29, 2015) (amending section 773(c)(5) of the Act to permit Commerce to disregard price or cost values without further investigation if it has determined that certain subsidies existed with respect to those values); *see also Dates of Application of Amendments to the Antidumping and Countervailing Duty Laws Made by the Trade Preferences Extension Act of 2015*, 80 FR 46793, 46795 (August 6, 2015).

[58] *See, e.g., Carbazole Violet Pigment 23 from India: Final Results of the Expedited Five-year (Sunset) Review of the Countervailing Duty Order*, 75 FR 13257 (March 19, 2010), and accompanying IDM at 4-5; *Certain Cut-to-Length Carbon-Quality Steel Plate from Indonesia: Final Results of Expedited Sunset Review*, 70 FR 45692 (August 8, 2005), and accompanying IDM at 4; *Corrosion-Resistant Carbon Steel Flat Products from the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 74 FR 2512 (January 15, 2009), and accompanying IDM at 17 and 19-20; *Final Affirmative Countervailing Duty Determination: Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 FR 50410 (October 3, 2001), and accompanying IDM at 23.

[59] *See Notice of Final Determination of Sales at Less Than Fair Value: Chlorinated Isocyanurates from the People's Republic of China*, 70 FR 24502 (May 10, 2005), and accompanying IDM at Comment 1.

countries because we could not be certain that these imports were not from an NME country or a country with generally available export subsidies.[60]

      b.    *Electricity, Water, and Natural Gas*

We valued electricity, natural gas, and water using the SVs that we used in the underlying review. Specifically, we valued electricity and natural gas using Eurostat's electricity and natural gas prices, respectively.[61] We valued water using prices from the National Public Utility Regulation Authority.[62]

      c.    *Labor*

We valued labor using the SV that we used in the underlying review. Specifically, we valued labor using the average monthly compensation for employees in Romania engaged in manufacturing fabricated metal products, except machinery and equipment. These data were reported by the Institutul National de Statistica and are collected monthly.[63] We converted the monthly compensation to an hourly wage using 24 workdays in a month and 8 hours in a workday.[64] We did not inflate or deflate the labor rates because they are contemporaneous with the POR.

      d.    *Movement Expenses*

We valued inland truck freight using the SV that we used in the underlying review. Specifically, we valued inland truck freight using data from *Doing Business 2020: Romania*.[65]

---

[60] *Id*.
[61] *Id*.
[62] *Id*.
[63] *See Preliminary Results* PDM at 29; *see also* Xinguang Rack's Letter, "Surrogate Value Comments," dated July 31, 2023 at Exhibit SV-3.
[64] *See* Preliminary SV Memorandum.
[65] *Id*.

e.   *Financial Ratios*

Pursuant to 19 CFR 351.408(c)(4), Commerce determines the amount of factory overhead expense, selling, general and administrative (SG&A) expenses, and profit to include in NV using publicly available data from companies in the surrogate country that produce merchandise that is identical or comparable to the merchandise under consideration.

We derived factory overhead, SG&A expenses, and profit using the financial statements that we used in the underlying review.  Specifically, we used Compa S.A. Sibiu's 2022 financial statements to calculate financial ratios.[66]  Compa S.A. Sibiu manufactures merchandise that is comparable to the merchandise under consideration, and its 2022 financial statements are contemporaneous with the POR.

**H.  Adjustments Under Section 777A(f) of the Act**

In applying section 777A(f) of the Act, Commerce examines: (1) whether a countervailable subsidy (other than an export subsidy) has been provided with respect to a class or kind of merchandise; (2) whether such countervailable subsidy has been demonstrated to have reduced the average price of imports of the class or kind of merchandise during the relevant period; and (3) whether Commerce can reasonably estimate the extent to which that countervailable subsidy, in combination with the use of NV determined pursuant to section 773(c) of the Act, has increased the weighted-average dumping margin for the class or kind of merchandise.[67]  For a subsidy meeting these criteria, the statute requires Commerce to reduce the weighted-average dumping margin by the estimated amount of the increase in that dumping margin due to a countervailable subsidy, subject to a specified cap.[68]  In conducting this analysis,

---

[66] *Id*.
[67] *See* section 777A(f)(1)(A)-(C) of the Act.
[68] *See* section 777A(f)(1)-(2) of the Act.

Commerce has not concluded that the concurrent application of NME antidumping and countervailing duties necessarily, and automatically, results in overlapping remedies. Rather, a finding that there is an overlap in remedies, and any resulting adjustment, is based on a case-by-case analysis of the totality of facts on the administrative record for that segment of the proceeding as required by the statute.

    1.    *Analysis*

For purposes of our analysis under sections 777A(f)(1)(A) and (f)(1)(C) of the Act, Commerce requested certain relevant firm-specific information from Dongsheng.[69] Specifically, Commerce requested information from Dongsheng regarding whether it received countervailed subsidies during the relevant period, information on its costs, and information regarding its pricing policies and practices. Dongsheng provided the requested information.[70]

Under section 777A(f)(1)(B) of the Act, Commerce is required to determine whether the countervailable subsidies have reduced the average price of U.S. imports of the class or kind of merchandise under consideration during the relevant period. In the underlying review, Commerce found that record evidence did not demonstrate a reduction in the average price of U.S. imports of the class or kind of merchandise under consideration during the relevant period. No new information regarding this prong of our analysis is on the record of this remand. Therefore, for the reasons explained in the underlying review, we continue to find that the import price trends on the record do not indicate a reduction in the average price of U.S. imports of the class or kind of merchandise under consideration during the relevant period. Because we must find a reduction in the average price of U.S. imports in order to reduce dumping duties to account for domestic countervailable subsidies, we did not make an adjustment in calculating

---

[69] *See* Double Remedies Questionnaire.
[70] *See* Double Remedies Response.

Dongsheng's dumping margin to account for domestic subsidies pursuant to section 777A(f) of the Act.

## I.  Export Subsidies

Pursuant to section 772(c)(1)(C) of the Act, when calculating EP or CEP, Commerce increases the reported U.S. price by the amount of any CVD imposed to offset an export subsidy. Commerce did not find countervailable export subsidies in the companion countervailing duty administrative review.[71]  Thus, we have not adjusted Dongsheng's U.S. sales prices of subject merchandise for countervailing duties imposed to offset an export subsidy.

## J.  Currency Conversions

Where appropriate, we made currency conversions into U.S. dollars, in accordance with section 773A(a) of the Act, based on the exchange rates in effect on the dates of the U.S. sales, as certified by the Federal Reserve Bank.

## V.    INTERESTED PARTY COMMENTS

**Commerce 1: Whether The Surrogate Value Comment Process Is in Accordance with Law**

The following is the petitioner's summary of its argument.  For further details, *see* Petitioner Remand Comments at 3-6.  No other parties submitted comments on this issue.

> {The petitioner} has concerns about the {SV} comment process because Dongsheng did not submit FOP descriptions until after the {SV} deadline had already passed.  Commerce reopened the record, collected questionnaire responses from Dongsheng, found that Dongsheng is entitled to a separate rate, and calculated a 24.26 percent weighted-average dumping margin for Dongsheng.  But throughout this process, Dongsheng failed to cooperate with repeated requests to submit its FOP description. Commerce allowed Dongsheng to escape its responsibility to report its FOPs in a detailed manner until after the deadline to submit {SV} information had already passed.  The Draft Remand Results are not, therefore, in accordance with law.

---

[71] *See Preliminary Results* PDM at 26-27.

**Commerce's Position:**  We disagree with the petitioner's position that Dongsheng failed to cooperate by not submitting descriptions of its FOP and that the Draft Remand is not in accordance with law.

In its first supplemental questionnaire, Commerce requested that Dongsheng provide full descriptions of all raw and packing materials that it used to produce/pack the merchandise under consideration during the POR.[72]  In its response to this supplemental questionnaire, Dongsheng provided suggested Harmonized Schedule (HS) categories for valuing FOPs and corresponding HS descriptions for each category.  However, it failed to provide full descriptions of the majority of the inputs that it used to produce/pack the merchandise under consideration.[73]  Section 782(d) of the Act provides that if Commerce determines that a response to a request for information does not comply with the request, Commerce shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency.  Consistent with this provision in the Act, Commerce again requested that Dongsheng provide "a detailed description of the physical characteristics (*e.g.*, dimensions, chemical composition, alloy or non-alloy, clad or not clad, high-strength, pickled, type of coating (surface treatment), industry or manufacturer specifications, shape, etc.) of each material input (direct materials and packing materials) and by-product reported in the FOP database."[74]  In response to this supplemental questionnaire, Dongsheng provided descriptions of its raw and packing materials including descriptions of the

---

[72] *See* December 10, 2025 Supplemental Questionnaire. Commerce did not request detailed descriptions of FOP in Section D of the AD Questionnaire (*see* Appendix VII of the AD Questionnaire).
[73] *See* December 22, 2025 SQR at Exhibit SQ-13.
[74] *See* January 26, 2026 Supplemental Questionnaire.

physical/chemical composition of the input, its form, and its dimensions.[75]  Therefore, contrary to the petitioner's claim, Dongsheng submitted FOP descriptions.

The petitioner also claims that because Commerce allowed Dongsheng to report detailed descriptions of its FOPs after the deadline to submit SVs had passed, the Draft Remand is not in accordance with law.  As an initial matter, Commerce did not provide Dongsheng with an opportunity to submit SVs after the applicable deadline had passed.  Rather, Commerce requested detailed information regarding the inputs that Dongsheng used to produce subject merchandise, which it identified in its response to section D of the AD Questionnaire.  Commerce's actions are consistent with the directions in section 782(d) of the Act to promptly inform a respondent of the nature of a deficiency in its response and to provide the respondent with an opportunity to remedy or explain the deficiency.  Hence, Commerce's actions are in accordance with the applicable law.

The petitioner also expressed concerns about the SV comment process because Dongsheng did not submit FOP descriptions until after the SV deadline had passed.  We do not find that the petitioner was prejudiced by Dongsheng's submission of detailed FOP descriptions after the deadline for submitting SVs.  The petitioner claimed that numerous HS categories could apply to certain inputs used by Dongsheng given its limited description of those inputs.  Therefore, the petitioner provided SV data from multiple HS categories for certain inputs and suggested averaging the average unit values of each HS category to derive an SV for the input.  After Dongsheng submitted detailed descriptions of its inputs, the petitioner could have refined its SV suggestions in its comments on the Draft Remand by identifying which of the multiple HS categories that it found potentially applicable to an input was the best available information for

---

[75] *See* February 3, 2026 SQR at Exhibit SQ3-2.

valuing the input.  Because the petitioner had an opportunity to comment on the appropriate SV for inputs after Dongsheng submitted detailed descriptions of its inputs, we find the petitioner was not prejudiced by Dongsheng's submission of detailed FOP descriptions after the deadline for submitting SVs.

Although not noted in the summary of its comments, the petitioner also argues that Commerce should base Dongsheng's estimated weighted-average dumping margin on adverse facts available (AFA) because Dongsheng failed to submit its FOP descriptions.  However, the petitioner has not identified a statutory basis for applying AFA to Dongsheng.

Sections 776(a)(1) and 776(a)(2) of the Act provide that, if necessary information is missing from the record, or if an interested party:  (A) withholds information that has been requested by Commerce; (B) fails to provide such information in a timely manner or in the form or manner requested subject to subsections 782(c)(1) and (e) of the Act; (C) significantly impedes a proceeding under the antidumping statute; or (D) provides such information but the information cannot be verified, as provided in section 782(i) of the Act, Commerce shall use, subject to subsection 782(d) of the Act, facts otherwise available (FA) in reaching the applicable determination.

Section 776(b) of the Act provides that Commerce may use an adverse inference in selecting from among the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information.[76]

Dongsheng timely submitted detailed FOP descriptions in response to Commerce's January 26, 2026 Supplemental Questionnaire.  Thus, necessary information is not missing from the record.  Moreover, we find that none of the bases under section 776(a)(2) have been satisfied.

---

[76] *See* 19 CFR 351.308(a).

Therefore, there is no basis to determine Dongsheng's estimated weighted-average dumping margin, in whole or in part, using FA. Because the application of facts available is not warranted, there is no basis for considering whether adverse inferences under section 776(b) are warranted.

**Comment 2: Whether Dongsheng Is Eligible for a By-Product Offset**

The following is the petitioner's summary of its argument. For further details, *see* Petitioner Remand Comments at 6-9 (internal citations omitted). No other parties submitted comments on this issue.

> {The} record does not support Dongsheng's claim for a scrap by-product offset, which should therefore be denied in the final remand results. Dongsheng reported that it did not track the quantity of scrap generated in the ordinary course of business. As a result, Dongsheng claimed a by-product offset based on the total quantity of scrap that the company sold during the {POR}. The problems with Dongsheng's claim for a by-product offset are like those that resulted in the denial for mandatory respondent {Xinguang Rack} in the final results of the underlying review. Like Xinguang Rack, Dongsheng is not entitled to a scrap by-product offset because the documentation submitted by Dongsheng does not substantiate the quantity of scrap generated from the production of subject merchandise during the POR. Dongsheng never submitted any production records to demonstrate that the quantity of scrap generated in the production of subject merchandise is equal to or greater than the quantity of scrap sold. Another problem is that based on the state of the record, Commerce cannot rule out the possibility that the scrap that Dongsheng sold included scrap generated from its production of non-subject merchandise. Therefore, in accordance with its practice, Commerce should deny Dongsheng's claim for a scrap by-product offset.

**Commerce's Position:** We agree with the petitioner and have not granted Dongsheng a scrap offset in the final redetermination.

Commerce's practice is to grant by-product/scrap offsets to the cost buildup of normal value for byproducts that are "… either sold or reintroduced into production during the {period of investigation (POI)/period of review (POR)}, up to the amount of that by-product/coproduct

actually produced during the POI/POR."[77]  Therefore, Commerce typically requires information on the quantity of a by-product/scrap generated in producing the merchandise under consideration during the applicable period to grant a by-product/scrap offset.  However, with respect to scrap, "{Commerce recognizes} that, in certain situations, a respondent's normal accounting system does not track scrap generated and only tracks the quantities of scrap sold.  In such instances, Commerce's policy is to allow the offset for scrap sold if a respondent can show a reasonable link between the quantities of scrap sold and scrap generated."[78]  Thus, where a respondent does not track the scrap that it generates, Commerce has found that it is reasonable to grant a scrap offset based on the quantity of scrap sold if the respondent can show that the quantity of scrap that it sold is less than the quantity of scrap that could have been generated.[79]

Commerce requested that Dongsheng "{p}rovide production records demonstrating production of each by-product during one month of the POR…as well as evidence of receipt of payment for the sale of the item for the largest month of sales for each byproduct."[80]  Dongsheng stated that it has no production, inventory, or accounting records to track the quantity of steel scrap generated, and that it does not weigh and record the weight of the steel scrap that it generates.[81]  According to Dongsheng, it only weighs the steel scrap that it generates when it

---

[77] *See* AD Questionnaire at D-9.
[78] *See Certain Steel Nails from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2021-2022*, 89 FR 7363 (February 2, 2024), and accompanying IDM at 23-24 (citing *e.g.*, *Finished Carbon Steel Flanges from Spain: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 7919 (February 12, 2020), and accompanying IDM at Comment 1); *Finished Carbon Steel Flanges from India: Final Results of Antidumping Duty Administrative Review; 2017-2018*, 85 FR 21391 (April 17, 2020) (*Steel Flanges from India*), and accompanying IDM at Comment 1); *Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review*; 2014-2016, 83 FR 4030 (January 29, 2018) (*Nails from Oman 2014-2016*), and accompanying IDM at Comment 11*; and Certain Steel Nails from the Sultanate of Oman: Final Results of Antidumping Duty Administrative Review; 2017- 2018*, 83 FR 58231 (November 19, 2018) (*Nails from Oman 2017-2018*), and accompanying IDM at Comment 4.
[79] *See Steel Flanges from India* IDM at Comment 1; *see also Nails from Oman 2014-2016* IDM at Comment 11; and *Nails from Oman 2017-2018* IDM at Comment 4.
[80] *See* AD Questionnaire at D-9 and D-10; *see also* December 23, 2025, Supplemental Questionnaire.
[81] *See* January 6, 2026, SQR at 3-4.

sells the scrap.[82]  Dongsheng claims that the quantity of steel scrap that it sold is close to the quantity of steel scrap that it generated because it periodically sells the steel scrap and does not reintroduced it into production.[83]  Therefore, Dongsheng based its scrap offset on the quantity of scrap that it sold during the POR.[84]  Dongsheng provided a sample accounting voucher and an invoice for its sales of steel scrap in April 2022.[85]

We find that there is insufficient record evidence to grant Dongsheng a scrap offset. First, Dongsheng has not provided any evidence of the quantity of steel scrap that it generated from producing the merchandise under consideration during the POR.  Commerce has routinely denied by-product offsets where a respondent does not maintain any production data regarding the quantity of the by-product generated.[86]  Second, Dongsheng has not demonstrated that the quantity of steel scrap that it sold during the POR is less than the quantity of steel scrap that it generated from producing the merchandise under consideration during the POR.  We find that it is possible that the quantity of steel scrap that Dongsheng sold during the POR exceeds that quantity of steel scrap generated from producing the merchandise under consideration during the POR since Dongsheng also produced merchandise that is not under consideration in this proceeding during the POR.[87]

---

[82] *See* DQR at 13.
[83] *See* January 6, 2026, SQR at 3-4.
[84] *Id*. at 3-4 and Exhibit SQ2-2.
[85] *Id*. at Exhibit SQ2-3.
[86] *See Certain Low Speed Personal Transportation Vehicles From the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 90 FR 26530 (June 23, 2025) and accompanying IDM at Comment 12 (citing *Certain Quartz Surface Products from the People's Republic of China: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 83 FR 58540 (November 20, 2018) and accompanying PDM at 34, unchanged in *Certain Quartz Surface Products from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value, and Final Affirmative Determination of Critical Circumstances*, 84 FR 23767 (May 23, 2019); and *Certain Fabricated Structural Steel from the People's Republic of China: Final Affirmative Determination of Sales at Less Than Fair Value*, 85 FR 5376 (January 20, 2020), and accompanying IDM at 130).
[87] *See* DQR at 5.

Additionally, although Dongsheng claims that the quantity of steel scrap that it sold is close to the quantity of steel scrap that it generated because it periodically sells the steel scrap, we find that the record does not show that Dongsheng sold steel scrap at the start and end of the POR and/or at regular intervals during the POR such that it would be reasonable to conclude that the quantity of steel scrap sold during the POR approximates that quantity of steel scrap generated during the POR.[88]

"The interested party that is in possession of the relevant information has the burden of establishing to the satisfaction of {Commerce} the amount and nature of a particular adjustment."[89]  Accordingly, Dongsheng bears the burden of providing all relevant documentation establishing its entitlement to a scrap offset.  Because Dongsheng failed to meet that burden, for these final results of redetermination, we have not offset Dongsheng's cost build-up of normal value with the value of the steel scrap that it sold.

## VI.    FINAL RESULTS OF REDETERMINATION

In consideration of the Court's *Remand Order*, we have treated Dongsheng as a mandatory respondent, granted Dongsheng a separate rate, and calculated an estimated weighted-average dumping margin for Dongsheng of 25.00 percent.  Because Dongsheng's weighted-average dumping margin is different from that calculated in the underlying *Final Results*, we intend to issue a *Timken*[90] notice with the amended final results should the Court sustain these

---

[88] *See* January 6, 2026, SQR at Exhibit SQ2-2.
[89] *See* 19 CFR 351.401(b)(1).
[90] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).

final results of redetermination and will issue relevant instructions, as appropriate, to U.S.

Customs and Border Protection.

2/23/2026

X _~Scot T. Fullerton~_ _____

Signed by: SCOT FULLERTON

Scot Fullerton
Acting Deputy Assistant Secretary
 for Antidumping and Countervailing Duty Operations